JAMES E. LEWIS, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 56073. Promulgated April 4, 1934.

*Thomas F. Veach, Esq.*, and *James E. MacCloskey, Esq.*, for the petitioner.

. *Nathan Gammon, Esq.*, for the respondent.

OPINION.

ADAMS: This proceeding involves a deficiency in income taxes for 1928 in the amount of $19,245.95. One question is presented by the appeal, namely, whether petitioner's share of the profits of a syndicate was income to him in 1928, under the doctrine of constructive receipt, or whether such share was income to him in 1929, when actually received.

In August 1927, petitioner executed the following agreement:

It is proposed to form a syndicate for the purchase of Common Capital Stock of the Inland Steel Company, at quoted market prices, the aggregate cost price of shares originally purchased not to exceed $5,000,000. This Syndicate will be managed by W. R. Burwell, and as Manager he shall have authority on behalf of all members of the syndicate to negotiate for, receive and pay for stocks, to hold, vote and control the same during the life of the syndicate; to buy and sell such stock at prices to be determined from time to time by him, and for that purpose to employ and compensate brokers and agents; to acquire on behalf of the syndicate any additional stock which may be offered in the market, and to re-sell the same, or any part thereof, provided that the purchase of such additional stock shall in no case increase the original liability of subscribers to this agreement; to borrow money for the purposes of the syndicate, and for that purpose to pledge this agreement, and/or the subscription rights and stock to be acquired by the syndicate.

The responsibilities of each subscriber shall be several. He will not be deemed the partner of any other subscriber or subject to joint liability of any kind.

The syndicate shall terminate April 30, 1928, unless sooner terminated by the Syndicate Manager. The Syndicate Manager may extend the period for not exceeding six additional months, upon giving notice to the subscribers. Upon the termination of the syndicate, gains or losses shall be distributed pro rata among the subscribers, and each member of the syndicate shall thereupon pay in full any amount which may remain unpaid upon the subscription, whereupon he shall be entitled to his proportional number of the shares then held by the Syndicate Manager.

[Signed] W. R. BURWELL.

The undersigned hereby subscribes to the foregoing agreement to the amount of $250,000 Dollars, and agrees to pay upon entering the syndicate $75,000 Dollars, representing thirty per cent of his commitment. The undersigned appoints the Syndicate Manager as agent in the purchase of said shares at any time and from time to time during the term of the syndicate, and agrees to pay, if called upon by the Syndicate Manager therefor, his proportionate

amount of the purchase price of such stock. The undersigned hereby releases the Syndicate Manager from any and all claims arising out of this agreement for any losses not caused by his willful misconduct.

[Signed]   J. E. LEWIS.

The term of the syndicate was extended for an additional six months from April 30, 1928, and thereafter the term was further extended for a second six-month period.

Under date of November 3, 1928, W. R. Burwell, the syndicate manager, who was also president of Continental Shares, Inc., offered the latter company, " the 96,906 shares now held in the Syndicate at a price of $70 per share which is the approximate price as of today, the terms of payment being $3,000,000 in cash and the balance in a 6% preferred stock of Continental Shares, Inc., with a suitable warrant attached to buy Common Stock with the understanding, however, that should any participant in the Syndicate wish to receive all cash for his interest, Continental Shares, Inc. will pay 100% in cash for this participant's proportionate interest. It would be further understood that the dividend payable to Inland Steel stockholders of record November 15th will be received to the credit of the Syndicate participants."

Under date of November 10, 1928, the vice president of Continental Shares, Inc., advised Burwell, as syndicate manager, that the directors had accepted the above offer, and stated that the company " will take immediate steps to issue for the purpose of the transaction a 6% preferred stock callable at $107.50, bearing a share for share warrant to purchase common stock at a price of $130 per share up to December 15, 1929, and at $150 per share up to and including December 15, 1930. It is expected that arrangements will be made whereby this preferred stock will be issued as of December 15, 1928. The purchase of the Inland Steel Common Stock will date from November 15, 1928, with interest at 6%."

On the same date Burwell notified Continental Shares, Inc., that the terms provided for were satisfactory, and addressed the following letter to the petitioner:

It has been my feeling that the syndicate should not continue indefinitely. There is a very real difficulty, however, in liquidating such a large holding on the market, or in disbanding with an assurance that all participants will share alike should they wish to sell. In view of this, on November 3rd, I, as Syndicate Manager, offered the holdings of the syndicate as a block to Continental Shares, Inc., at a price of $70 per share plus the accrued dividend, which was the market price on that day, payable $3,000,000 in cash (the approximate amount of the syndicate's bank loans) and the balance in a 6% preferred stock of Continental Shares.

The offer has been accepted and Continental Shares will take immediate steps to issue a preferred stock callable at $107.50 per share and bearing a share for share non-detachable warrant for the purchase of common stock at a price of $130 per share up to December 15, 1929 and at $150 per share

up to December 15, 1930. Participants in the syndicate may thus receive for their 30% payment, plus their profit amounting to approximately 180% on this payment, a 6% preferred stock, on the basis of $101 per share, with a warrant which will enable them to participate in the future appreciation of a diversified list of holdings whose market value following the completion of this transaction will exceed $48,000,000. The common stock to which the warrants apply is now selling at $110 per share. I enclose a recent balance sheet of Continental Shares.

Should any participant wish to receive cash instead of the preferred stock, arrangements have been made through an underwriting of the issue whereby he may do so.

In consummation of the purchase of the syndicate's holdings, Continental Shares, Inc., entered into an agreement with Otis & Co. whereby the latter agreed to underwrite the sale of the 40,000 shares of preferred stock. Under the agreement Otis & Co. was to receive a commission of one dollar per share for stock accepted by the syndicate members or sold and delivered to stockholders of the corporation, and it agreed to purchase the remaining shares at $101 per share, plus accrued dividends from December 15, 1928, but less a commission of $2.50 per share.

The parties have stipulated that " on December 1, 1928, a meeting of Continental Shares stockholders occurred, at which the issue of 40,000 shares of Continental stock in question was authorized, and that such stock was issued on December 15."

After receiving the letter dated November 10, 1928, Lewis discussed his option of taking cash or preferred stock in Continental Shares, Inc., with one Croft, a business associate who was also a member of the syndicate. Lewis informed Croft that he preferred his proportionate part of the Inland Steel common stock, or in lieu thereof, cash, and that he did not want preferred stock of Continental Shares, Inc. Lewis did not personally inform Burwell of his election to take cash, but he had every reason to believe that Croft would convey his wishes to Burwell.

Under date of December 7, 1928, Burwell advised Lewis as follows:

I was hoping to see you in Cleveland this week, but as you have probably delayed your trip, I am writing to say that we will send you a cheque for your interest in the Inland Steel Syndicate on January 2nd.

[Signed] W. R. BURWELL, *Syndicate Manager.*

Lewis replied on December 10, 1928, as follows:

Replying to your letter of the 7th inst., I regret that it was impossible for me to be in Cleveland last week. I am pleased to note that a check will be sent to me on January 2nd for my interest in the Inland Steel Syndicate.

[Signed] J. E. LEWIS.

Petitioner's next communication from the syndicate manager was a letter dated January 2, 1929, enclosing a check " for $211,610.53 in full payment of your interest in the Inland Steel Syndicate." The

letter contained the following detailed statement of petitioner's account with the syndicate:

STATEMENT OF ACCOUNT OF

MR. J. E. LEWIS

with the

INLAND STEEL SYNDICATE

as of

January 2, 1929

| | |
|---|---:|
| Payment made by Participant August 8, 1927 | $75,000.00 |
| Interest adjustment for late entrance | 854.17 |
| | $74,145.83 |
| Proportionate share of profits * | 135,785.25 |
| Amount due Participant November 15, 1928 | $209,931.08 |
| Interest on above amount at 6% from Nov. 15, 1928 to Jan. 2, 1929 | 1,679.45 |
| Amount now being paid to Participant by cheque | $211,610.53 |

* For income tax purposes the way in which the profits are made up is shown here:

| | | | | | |
|---|---|---|---|---:|---:|
| Proportionate share of dividends received | | | | $39,285.20 | |
| " | " | " | interest earned | 177.85 | |
| " | " | " | " received from late entrants | 966.50 | |
| " | " | " | profit from sale of securities | 108,282.65 | |
| | | | | | $148,712.20 |
| " | " | " | interest expense | $11,510.80 | |
| " | " | " | miscellaneous expense | 1,416.15 | 12,926.95 |
| Net Profit | | | | | $135,785.25 |

Under date of January 3, 1929, Lewis acknowledged receipt of Burwell's letter with enclosed check.

Payment of the purchase price by Continental Shares was handled to a great extent through accounts with Otis & Co. The Inland Steel Syndicate had an account with Otis & Co. designated as account X–41, while Continental Shares, Inc., had an account with that company designated as X–34. The books and records of Otis & Co. show a transfer of $483,924.54 by journal voucher No. 58, dated January 2, 1929, from account X–34 to account X–41. The latter account shows a credit entry dated January 2, 1929, of $483,924.54 and five debit entries under the same date, representing disbursements by check, one of which was the $211,610.53 payment made to Lewis.

The credit position of Continental Shares, Inc., from December 15 to December 31, inclusive, was such that it could have paid any syn-

dicate participant upon being advised by the syndicate manager of the form of payment to be made. At no time did the petitioner inform the syndicate manager or anyone else that he desired payment at once or at any time in the near future. Petitioner made no demand for payments, nor did he make any effort to collect his proportionate part of the proceeds prior to receipt of the check on January 3, 1929.

The petitioner kept his books and reported income on a cash receipts and disbursements basis. He reported his syndicate profits as income for 1929, but respondent has determined that the profits were constructively received in 1928 and taxable in that year.

Petitioner contends that, since his books were kept and his income reported on the cash receipts and disbursements basis, he received his share of the syndicate profits in 1929. He insists that, under the contract of sale and agreement with the syndicate manager, evidenced by the letters of December 7 and 10, *supra*, he had no legal right to the profits until 1929; that no funds were set aside for him in 1928; that the syndicate manager represented not only the syndicate subscribers, but also was president of the purchasing company; that the latter company derived a monetary advantage from postponing payment in cash; that he merely submitted to and acquiesced in the time of payment; and, finally, that the doctrine of constructive receipt should be sparingly applied and is not applicable to the evidence adduced in this proceeding.

Respondent argues that, since he determined that petitioner received or could have received his proportionate interest of the syndicate profits in 1928, petitioner has the burden of proving otherwise; that petitioner could have received payment in full during 1928; and that as a member of the syndicate his proportionate interest in the profits realized in 1928 are taxable to him, whether distributed or not.

An analysis of petitioner's argument reveals certain fallacies and inconsistencies which are fatal to his contentions. In the first place the contract of sale shows that 96,906 shares of Inland Steel common stock were offered and accepted at $70 per share, or a total consideration of $6,783,420, payable $3,000,000 in cash and the balance in preferred stock or cash. The contract states specifically that the purchase dated from November 15, 1928, and presumably the $3,000,000 in cash was paid at or about the time the sale was made. Certainly nothing to the contrary appears in the record, and the contract of sale states that " arrangements " for the issuance of preferred stock would probably be completed by December 15, 1928, so that the balance due could be paid in stock or cash at the election of the syndicate members. It is a fact of record that some subscribers were

paid during 1928, indicating that the sale was a closed and completed transaction in 1928 and that income was realized from the sale.

Nevertheless, says petitioner, the letters of December 7 and 10 show that the syndicate manager and the taxpayer agreed that the latter should be paid his portion of the syndicate profits on January 2, 1929. Taxpayer urges that this private agreement prevented him from demanding or securing payment of his proportionate share subsequent to the exchange of correspondence. The answer to this argument lies in the fact that petitioner knew after receiving the letter of November 10 from Burwell that he would accept only cash for his interest in the syndicate, and, therefore, the arrangements for issuance of preferred stock as of December 15, 1928, was of no moment to him. We deem it unnecessary, therefore, to speculate on what petitioner's legal rights were subsequent to their exchange of letters on December 7 and December 10. His rights were fixed at the time the sale was consummated on November 15, 1928. A further answer lies in the fact that while the alleged agreement between Lewis and Burwell might be upheld as between themselves, it is by no means certain that Lewis by private agreement can postpone the receipt of income from one taxable year to another. See *Hamilton Nat. Bank of Chattanooga, Administrator*, 29 B.T.A. 63, and cases there cited.

Secondly, petitioner argues that, since no funds were set aside to pay him during 1928, and since he merely submitted to and acquiesced in the time of payment, he realized income in 1929 when the money was forthcoming from the vendee as shown by the books and records of Otis & Co. While the entries in said books of account show the transfer of funds as of January 2, 1929, the other evidence of record shows that the credit facilities of the vendee corporation were ample to pay the petitioner at any time after the sale was consummated. When the sale of the syndicate holdings was consummated the existence of the syndicate terminated, and by the terms of the syndicate agreement petitioner became entitled to his share of the syndicate assets.

Petitioner further contends that the dual capacity of Burwell in the transaction is an important factor in this case. Burwell was appointed by each syndicate subscriber as his agent to buy Inland Steel common stock, but he was also the president of Continental Shares, Inc., the vendee in the purchase of the syndicate holdings. If his relationship to the syndicate subscribers imposed certain duties upon him which conflicted with his duties as president of Continental Shares, Inc., this question should have been raised at the time of the sale, and the propriety of Burwell's conduct examined. We are unable to agree, however, that this factor can influence taxpayer's legal rights to the income realized by the sale.

Petitioner also argues that the vendee corporation derived a financial benefit from postponing payment to Lewis and other syndicate subscribers who elected to take cash instead of preferred stock. Whether this be true or not, it seems entirely immaterial to the question here for consideration. It might explain the reason why Burwell, as president of the vendee corporation, would like to postpone cash disbursements as long as possible, but it has little probative value on the question of whether petitioner constructively received income in 1928.

Finally, petitioner argues that the doctrine of constructive receipt should be sparingly applied, and that the doctrine is inapplicable to the facts existing in this appeal. However, it is our opinion, as previously indicated herein, that the facts point to but one conclusion, namely, that petitioner could have obtained his portion of the profits by merely asking for them in 1928. That he passively awaited their receipt cannot alter the fact that the proceeds were available. On the record we believe that petitioner constructively received his portion of the proceeds in 1928.

In so holding we have carefully considered the numerous cases cited by counsel on brief relative to the doctrine of constructive receipt and the taxable status of syndicates. All of these cases turn on their own particular facts, and while in some of them the facts closely resemble the present case, none of the cases examined was completely in point.

The case particularly relied upon by petitioner is *Sidney F. Tyler et al., Trustees*, 28 B.T.A. 367, wherein the Board refused to apply the doctrine of constructive receipt to the sale of stock where the stock to be sold and the purchase price were deposited with an agreed depositary. Under the terms of the deposit agreement the vendor had no right to the proceeds of the sale until after January 1, 1928. The Board refused to hold that receipt of the purchase price by the depositary constituted receipt by the vendor, and stated that in its opinion the depositary was acting in a fiduciary capacity and could not be considered an agent of the vendor, as contended by the Commissioner. Furthermore, the Board pointed out, the vendor had no right under his agreement to the proceeds until after January 1, 1928.

The facts here are more analogous to those existing in *Henry C. Heinz*, 28 B.T.A. 276, where the Board held that all events had transpired on or before November 16, 1928, to fix the taxpayer's distributive share of the syndicate profits, and that the taxpayer, although on a cash basis, constructively received the income in 1928, even though the proceeds were not actually received until February 26, 1929. In reaching this conclusion, the Board pointed out that the court decisions in *Wild* v. *Commissioner*, 62 Fed. (2d) 777, and

*Glenmore Securities Corp.* v. *Commissioner*, 62 Fed. (2d) 780, which have been cited by petitioner herein, were distinguishable in that the income there in controversy had been accumulated or retained by the syndicate manager for future investment or eventual distribution.

The same distinction applies here, because the sale of the syndicate's assets terminated the syndicate as of November 15, 1928, and at that time petitioner became entitled to his proportionate part of the syndicate proceeds. Since the means were available to satisfy petitioner's claim, he may not deliberately turn his back upon income and thus select the year for which he will report it, *Hamilton Nat. Bank, supra.*

Reviewed by the Board.

*Decision will be entered for the respondent.*

SMITH concurs in the result.

BLACK, MARQUETTE, ARUNDELL, and McMAHON dissent.