E. J. Sparks v. Commissioner.
Sparks v. Commissioner
Docket No. 1830.
United States Tax Court
1945 Tax Ct. Memo LEXIS 92; 4 T.C.M. (CCH) 854; T.C.M. (RIA) 45277; August 28, 1945
*92 The petitioner gave his collateral note for $50,000 dated December 1, 1928 and thereafter, in 1930, made a payment on the note reducing the principal balance to $34,766.31. There were no further payments of principal and no interest was paid after that date. In 1939, pursuant to a contract involving numerous matters connected with the mutual theatre interests of petitioner and the payee, the payee released the collateral and delivered it to petitioner. The petitioner at all times was financially able to pay the note. In 1942 the note was cancelled and returned to petitioner on payment of $500 and petitioner reported receipt of $34,266.31 income therefrom for that year. Respondent determined a deficiency for 1939 when the collateral was released on the ground that income of $34,766.31 was derived in that year. Held: Petitioner properly reported the receipt of taxable income from the settlement of his note in 1942. John W. Donahoo, Esq., for the petitioner. F. L. Van Haaften, Esq., for the respondent. TYSON Memorandum Findings of Fact and Opinion Respondent determined a deficiency in petitioner's income tax for the calendar year 1939 of $21,366.86, stating *93 as the basis thereof, that "It has been determined that there was a realization of taxable income in the year 1939 when the securities pledged by the taxpayer as security for his note dated June 1, 1928 to Famous Lasky Corporation were returned to the taxpayer." Findings of Fact The petitioner is an individual, residing at Miami Beach, Florida. He filed his income tax return for the calendar year 1939 with the collector of the District of Florida, on a cash basis. In about 1925 petitioner re-entered the business of operating motion picture theatres, from which he had retired in the early 1920's. He thereafter operated theatres in some of the smaller localities in Florida and built two theatres in Jacksonville and one in St. Petersburg. His activities brought him in competition with the Paramount Famous Lasky Corporation (hereinafter referred to as Paramount) which at that time owned or controlled many motion picture theatres in Florida. About December 31, 1927 petitioner made an arrangement with Paramount whereby certain theatres of Paramount were to be pooled with those of petitioner, petitioner to operate all those theatres. Petitioner was also to acquire other theatres for *94 the use of himself and Paramount. In connection with this arrangement Paramount loaned petitioner $50,000 for which he gave his promissory note dated December 1, 1927, secured by 600 shares of stock of Consolidated Theatres, Inc. On June 1, 1928, petitioner executed a renewal note, due December 1, 1928, in the same amount, and secured by the same collateral. The renewal note was executed at Jacksonville, Florida, was payable at the Florida National Bank in Jacksonville, and bore interest at eight per cent from date. The note provided, inter alia, that the payee, Paramount, should have full power and authority upon a default in payment thereof, to sell, assign, and deliver the collateral at private or public sale at the payee's option, and the maker agreed to remain liable for any deficiency after such sale, with interest at eight per cent until paid. Consolidated Theatres, Inc,.was a holding company controlled by petitioner. At the time its stock was pledged as collateral to the above mentioned note it and Paramount each owned one-half the stock of a company which owned a number of theatres in Jacksonville, Florida. The pledged collateral was not worth the face amount of the note *95 at the time it was pledged. December 15, 1930 petitioner paid Paramount $15,233.69 on the principal of the renewal note, leaving an unpaid principal balance thereon of $34,766.31. No interest payments were made at any time after December 1930. In 1932 Paramount wrote off on its books the principal of the note and interest of $4,110.07 accrued to June 4, 1932 as uncollectible, but left the note on the books at a nominal value of $2, allocated equally between the principal and interest. In all its negotiations with petitioner thereafter Paramount considered the note of value and continued to treat it as an existing obligation of petitioner. Shortly after 1929 Central Florida Theatres, Inc. was operating a chain of theatres in about a dozen towns in central Florida. It went into bankruptcy, and petitioner acquired all its theatres. He also acquired all the theatres in West Palm Beach, Florida. It was understood he was acquiring all the theatres for the joint interest of Paramount and himself, in accordance with the prior arrangement of about December 31, 1927, but as Paramount was then in receivership petitioner held all of the properties in his own name and Paramount had no evidence *96 of its ownership interest. Sometime between 1932 and 1935 Paramount began working its way out of receivership and began inquiring of petitioner when it was going to receive its shares of the property which petitioner had acquired for their joint interest. Petitioner was then interested in getting his note cancelled "because he had done a lot of work for Paramount"; so he and Paramount began negotiations which almost resulted in a deal being made in 1937. Petitioner and his attorney were concerned throughout those negotiations and those hereinafter mentioned as culminating in an agreement of January 14, 1939 as to the best method of handling the note from the viewpoint of having petitioner pay as small a tax as was legally possible in the event an agreement was completed with Paramount. The attorney suggested consultation with a tax specialist, which was done. Both petitioner's attorney and the tax specialist recommended as the best method that petitioner arrange with Paramount that it charge off all accrued interest on the note, return his collateral to him, and that then petitioner should pay off the principal amount of the note over a period of years. Petitioner decided in 1937 *97 to try to make this arrangement in the pending deal with Paramount. While the above mentioned deal was pending petitioner and his attorney discussed the question of whether the note was barred by the statute of limitations. The attorney decided that the Florida statute of five years was applicable, but that since the collateral had become very valuable and could, in the opinion of the attorney, be realized on by Paramount regardless of any bar of the statute of limitations to action on the note, they decided that such bar made no difference. Negotiations were continued until in 1937, but failed to result in an agreement, partly because the man in charge of the Paramount theatres was transferred to the "coast" so that negotiations had to be started over again with other representatives of Paramount in New York. Conditions were fluctuating greatly during the period of the negotiations, and up to 1939, and petitioner would attempt to obtain an agreement more favorable or less favorable to himself as his situation improved or deteriorated. In the latter part of 1938 petitioner and Paramount again began negotiating an agreement which was finally incorporated in a written contract signed *98 under date of January 14, 1939. The contract was executed by petitioner, as party of the first part; his wife, Wynona T. Sparks, as party of the second part; Frank Rogers, M. C. Talley, and B. B. Garner, as parties of the third part; Paramount Pictures, Inc., successor to Paramount Famous Lasky Corporation, as party of the fourth part; and Florida State Theatres, Inc., hereinafter referred to as Management Corporation, party of the fifth part. At the time of the execution of the 1939 contract the parties thereto, except the Management Corporation, owned or controlled about 110 theatres in the State of Florida, each party owning or controlling a certain number. The contract is very lengthy and complicated and contains numerous undertakings of the various parties as between themselves and others of the parties. All the parties to the contract agreed therein that the operations of all the theatres included in the contract were thereafter to be under the control and management of the Management Corporation. The contract also provided for the employment of petitioner by the Management Corporation as its president and executive general manager at a weekly salary of $800 and for the *99 employment of Paramount Service Corporation as its consultant and advisor at a compensation of $150 per week. It also provided for the employment by Management Corporation of Rogers, Talley, and Garner. Petitioner's employment would terminate whenever he ceased to hold one-half of the shares of Management Corporation or whenever he or his wife ceased to hold a majority of the stock of the theatre corporations controlled by them. Petitioner, his wife, Rogers, Talley, and Garner each agreed in the contract that during the term of the respective employments of petitioner, Rogers, Talley, and Garner, they would not directly or indirectly through corporations controlled by them, or either of them, or through any business with which they, or either of them, were connected engage in the theatre business in Miami, Miami Beach, Pensacola, Hialeah, or Coral Gables, Florida. The contract reads, in part, as follows: "WHEREAS, Mr. Sparks owns and controls a majority of the issued and outstanding shares of capital stock of Consolidated Theatres, Inc., a Florida corporation, (hereinafter referred to as 'Consolidated'); and "WHEREAS, Consolidated and Paramount, respectively, own and control *100 the following number of shares of the designated class of stock in the following respective Corporations * * *. and * * * * *
"WHEREAS, Mr. Sparks, the holder and owner of all of the issued and outstanding shares of capital stock of the Management Corporation, has agreed at or prior to the closing hereinafter provided for, to have transferred, set over and assigned to Paramount, at the par value thereof, one-half of the authorized shares of the capital stock of said Management Corporation; * * * * *
"NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained the parties hereto agree as follows: "1. Mr. Sparks agrees at or prior to the closing, to have transferred, set over and assigned to Paramount one-half of all of the authorized shares of stock of the Management Corporation at the par value thereof and agrees to retain the other one-half of all of the authorized shares of stock of said corporation, so that Mr. Sparks and Paramount will at the closing each own a one-half interest in the Management Corporation, it being understood and agreed by the parties hereto that the said transfer of stock to Paramount shall be a condition *101 precedent to the performance of any of the terms and conditions of the agreement by Paramount. * * * * *
"7. Paramount agrees it will at the closing or as soon thereafter as is practicable, vote its stock in said Management Corporation to cause the election of Mr. Sparks as President of the Management Corporation; and the Management Corporation agrees at the closing to enter into an agreement (substantially in the form and upon the terms and conditions set forth in Exhibit "E" attached hereto) to employ Mr. Sparks to serve as President and Executive General Manager in charge of the active management and operation of its business and affairs, subject, however, at all times to the direction and control of the board of directors of the Management Corporation, for a term commencing as of the 29th day of January, 1939, and continuing during the life of Mr. Sparks at a weekly compensation of Eight Hundred ($800.00) Dollars, payable at the end of each week; provided, however, that such employment shall be immediately terminated upon the happening of any of the following contingencies: * * * * *
"20. Paramount further agrees that at the closing it will: "(a) release to Mr. *102 Sparks Six Hundred (600) shares of common stock of Consolidated deposited with it to secure payment of a promissory note dated June 1, 1928 in the reduced amount of Thirty-Four Thousand Seven Hundred Sixty-Six and 31/100 ($34,766.31) Dollars, bearing interest at the rate of eight (8%) per cent. per annum, made by E. J. Sparks to Paramount (formerly called Paramount Famous Lasky Corporation); and * * * * *
"29. The parties hereto further agree that any and all instruments, agreements, checks, etc., to be delivered or executed and such other action as may be required to be taken under the provisions of this agreement shall be done at a closing to be held at 1701 Congress Building, Miami, Florida, thirty (30) days from the date of the execution of this agreement, or at such other time and place as the parties hereto may determine." * * * * *
The contract represented the entire agreement between Paramount and petitioner (there being no other or "side agreements" between them), and it contained no provision relative to cancellation, settlement, or compromise of petitioner's note. Settlement of the note was not provided for in the contract because Paramount was willing to cancel *103 the note only on certain conditions, with which petitioner was unwilling to comply, for had he done so he would not have received from Paramount as much as he would have had to pay on the note. The matter of settlement of the note was therefore left open. The 600 shares of Consolidated stock, collateral thereto, were returned to petitioner by Paramount in 1939 as provided by the contract. At that time the collateral was worth over $250,000. The Management Corporation was organized for the purpose of performing the duties provided for it in the contract. All of its original issue of five shares of stock was owned by petitioner. A representative of Paramount suggested that petitioner's note of June 1, 1928 be turned into the corporation in payment for the stock Paramount was to receive at or prior to the closing of the agreement of January 14, 1939, and stated: "* * * it will be set up in a corporation where Sparks owns one-half and Paramount owns one-half, and Sparks will know whatever kind of deal they make about compromising the note subsequently, he will have to agree to, since he owns half of the stock of the corporation, and we are not worried about the outcome anyway, if we *104 were, we would not have made a deal with Sparks, * * * Let's let it in there, and take care of it." The petitioner agreed to this proposition. The closing date of the contract was delayed until February 22, 1939 because of the time required in preparing the many necessary papers. On that date, the contract was closed and, on the same date, the directors of the Management Corporation including petitioner met and were presented with a written offer by Paramount to exchange petitioner's note of June 1, 1928, endorsed without recourse, for five shares of the corporation's stock, it being understood that the collateral security recited in the note was not to be included. The directors, petitioner although a director not voting, adopted a resolution accepting the offer and directing that five shares of the corporation's stock having a par value of $100 per share be issued to Paramount. It was further "RESOLVED that the exact valuation by the Board of Directors of this Corporation of the said promissory note so to be received by this Corporation shall for the time being be postponed, but that, as and when the Board of Directors of this Corporation determines such valuation, any amount *105 thereof in excess of $500 shall be considered as capital surplus of this Corporation." A representative of Paramount thereupon entered the meeting, endorsed and delivered on behalf of Paramount petitioner's note to the treasurer of the corporation and was issued and received five shares of the corporation's stock. The corporation set the note up on its books at $500. Within less than a year after the execution of the contract of January 14, 1939, petitioner and Paramount began having friction, and petitioner decided to sell out to Paramount, which wanted to buy. Negotiations were then begun leading to that end. The matter of petitioner's note was considered in the negotiations. Paramount was willing to cancel the note provided petitioner met various requirements such as giving up his contract with Management Corporation, which Paramount estimated was worth $50,000, or cancelling all indebtedness against the Arcade or Palm Beach Theatres and under various conditions. These negotiations were continued until about the middle of 1941 when petitioner sold his five shares of the Management Corporation to Paramount which thereafter owned all the stock of that corporation. Petitioner then *106 also severed all his connections with Paramount, except that for a period of about two years he remained subject to call by Paramount at $200 a week in an advisory capacity to the inexperienced people who replaced him. Petitioner's note then held by the Paramount owned Management Corporation was not involved in connections with this severance of relations. Petitioner, however, had suggested to his attorney that something should be done about the note before Paramount acquired all his stock, but the attorney advised him not to cloud the situation by arguing about the note at that time because the collateral had been released and he could now plead the statute of limitations if he didn't want to pay the note. He suggested that another deal could be made later respecting the note. At an unspecified date, but apparently sometime in 1942, an agent of the Bureau of Internal Revenue informed the Management Corporation that it would have to pay a tax on $3,704.11 interest which had accrued for the year 1939 on the note of petitioner held by it. That corporation filed a protest to the effect that it had received no interest and would not receive any interest thereon, that the principal of *107 the note was uncollectible, and that the statute of limitations had run on the note. The protest was granted and no tax was paid. At or about the time of the protest the Management Corporation informed petitioner of the proposal to tax the accrued interest and asked him what he was going to do about it - that that corporation wanted to "get the thing cleaned up". Petitioner's former attorney, who was then vice-president and counsel for the Management Corporation and was a member of its board of directors until he went into the Navy in 1943, took the matter up with petitioner, who was then represented by another attorney, and as a result an arrangement was made by which petitioner in December 1942 sent a check for $500 to the Management Corporation and received his note in exchange therefor. Petitioner at no time prior to this transaction had arranged for cancellation of the principal debt evidenced by the note; nor had he at any time prior thereto refused to pay it, or threatened to plead the statute of limitations to an action on it. For many years prior to 1939 and for many years thereafter petitioner was financially able to pay the note. Petitioner in his income tax return for *108 1939, filed on a cash basis, reported income from salaries from the Management Corporation in the amount of $40,316.89 and income from dividends of $65,823.09, with a net income of $94,125.25 and a tax liability of $30,241.90. The respondent in his computation of the deficiency for 1939 included in the income of petitioner the principal face amount of the note in the amount of $34,766.31. He included no interest on the note in that computation. Petitioner received the revenue agent's report covering the year 1939 on September 24, 1942. On March 13, 1943, petitioner filed his income tax return for 1942 reporting income from salaries from Management Corporation in the net amount of $9,795.83 after deducting expense of $604.17. He also reported income from "Settlement Note Indebtedness due Florida State Theatres, Inc., Principal Note $34,766.31 Amount paid in compromise $500.00", leaving $34,266.31 reported as income. The net income reported on the return was $27,937.94 and the tax liability $11,426.87. The gain derived by petitioner from the settlement of his note of $34,766.31 by the payment of $500 was derived in 1942 and not in 1939. Opinion TYSON, Judge: The sole issue *109 is whether or not the indebtedness of petitioner evidenced by his note was cancelled in 1939 thus resulting in taxable gain to petitioner in that year in the amount of $34,766.31, the unpaid principal balance of the note. In his income tax return for 1942 petitioner reported as income the amount of this unpaid principal less the $500 he paid in that year in settlement thereof. The petitioner's position is that there was a realization of taxable income, not in 1939 when the pledged securities were returned to him, but in 1942 when the note for the payment of which the securities had been pledged as collateral was cancelled and returned pursuant to a compromise settlement in that year. The respondent's position is that a realization of taxable income was had in 1939 when the pledged securities were returned to the petitioner and that the amount of that income is the $34,766.31 unpaid principal balance of the note. To sustain this position respondent contends: (1) That it was the intention of Paramount and petitioner in executing the contract of January 14, 1939, under the provisions of which the collateral was returned to petitioner, that petitioner be relieved of liability on the *110 note at that time, and that the amount of that liability was the measure of compensation to petitioner for his services in acquiring and expanding theatres in Florida for the joint benefit of petitioner and Paramount; and (2) that the transaction whereby the collateral was returned to petitioner constituted an anticipatory arrangement to prevent recognition of income for tax purposes in 1939. Petitioner's net taxable income as reported for 1942 was $27,937.94 and his net taxable income as reported for 1939 was $94,125.25. If the income in question was, in fact, received by petitioner in 1939 his tax liability for that year will exceed such liability for 1942. Petitioner received the loan represented by the note involved from Paramount in connection with an arrangement whereby he was to pool his theatres with those of Paramount, acquire other theatres for their joint use, and operate all of them for their joint benefit. Under that arrangement petitioner proceeded to acquire a large number of theatres, but held the properties thus obtained in his own name, Paramount being then in receivership. Sometime between 1932 and 1935 Paramount began working itself out of receivership and began *111 negotiating with petitioner with a view to adjusting their respective interests in the acquired theatres. During those negotiations petitioner, on advice of his attorney and tax counsel, sought to have Paramount charge off all the accrued interest on the note, release his collateral, and to arrange for payment of the principal over a number of years, as petitioner and his attorney figured this to be the best arrangement for petitioner from an income tax standpoint. These negotiations failed in 1937. Late in 1938 Paramount and petitioner renewed negotiations respecting their various theatre interests and those negotiations resulted in the written contract of January 14, 1939 between Paramount, petitioner, and other parties. In accordance with the express provisions of this contract the collateral securing the note in question was returned to petitioner in that year. The contract contained no provision relative to the compromise or cancellation of the note. The contract represented the entire agreement between Paramount and petitioner and there was no "side" or other agreement between them. Settlement of the note was not provided for in the contract because Paramount was willing to *112 cancel the note only upon conditions with which petitioner would not comply. The matter of settlement of the note was therefore left open. Petitioner was at all times financially able to pay the note. Within less than a year after the execution of the contract of January 14, 1939, petitioner and Paramount had friction as a result of which petitioner decided to sell out to Paramount, which wanted to buy. Negotiations looking to that end were begun between petitioner and Paramount and the matter of the settlement of the note was considered. Paramount was still willing that the note then owned by Management Corporation be cancelled upon consummation of the projected deal when Management Corporation would be wholly owned by Paramount, provided petitioner met certain requirements, such as giving up his contract with Management Corporation or the cancelling of certain indebtedness of two theatres. The negotiations were continued until 1941, when petitioner sold his five shares in the Management Corporation to Paramount and severed all his connections with Paramount, except that he was retained in an advisory capacity. No settlement of the note resulted from these transactions as petitioner's *113 attorney advised him not to cloud the negotiations by arguing about the note, since because of the running of the statute of limitations petitioner need not pay the note unless he desired and he could make a later deal with regard to the note. Settlement of the note was not made by petitioner until in 1942, as a result of an arrangement with Management Corporation, the note was cancelled and turned over to petitioner in consideration of his payment of $500. We think the facts above recited clearly show that there not only was no agreement reached by Paramount and petitioner in 1939 that the note be cancelled in that year, but we think they also show that neither had any intention that it should be so cancelled. In support of his contention that it was the intention of Paramount and petitioner that petitioner be relieved of liability on the note under the contract of January 14, 1939, respondent argues briefly that the release of the collateral constituted payment for services previously rendered by petitioner in acquiring the theatres while Paramount was in receivership which he and Paramount were to pool. However, the facts lend no support to that argument. The 1939 contract comprised *114 the entire agreement between Paramount and petitioner in that year. There is no mention in it of the amount or value of such services, or of the services at all, which there would no doubt have been had it been intended to thereby release the collateral in payment for the services. The respective undertakings of Paramount and petitioner in the contract were entirely contractual and we cannot inject into the contract undertakings of the parties which are not specified therein. Moreover, the record is devoid of any proof indicating that petitioner had not, prior to the contract of January 14, 1939, received adequate compensation for his services in acquiring and operating the pooled theatres. For all that appears, such services might have been, and probably were, fully compensated for by the interest petitioner received in those theatres. We also think that the recited facts show there was no anticipatory arrangement on the part of petitioner to prevent recognition of income for tax purposes in 1939, for there is no indication therein or elsewhere in the record that Paramount and petitioner in 1939 made any arrangement that the note would be cancelled in any subsequent year, and of *115 course if there was no such arrangement between the two necessary parties to the note there could obviously have been no anticipatory arrangement on the part of petitioner by a unilateral intention on his part to that effect even though he had such intention. On the contrary, the facts show constant efforts prior to the execution of the contract of January 14, 1939 and long subsequent thereto of both petitioner and Paramount to settle the outstanding note, each seeking to settle on terms most advantageous to him or it and that no terms of settlement could be agreed upon by Paramount and petitioner until 1942 when settlement was made between petitioner and Paramount's wholly owned subsidiary, the then holder of the note. Under the facts here, none of the cases cited by respondent is apposite. The cases of Hamilton National Bank of Chattanooga, Administrator, 29 B.T.A. 63 and James E. Lewis, 30 B.T.A. 318, might be if at the time of the execution of the contract, or thereafter in 1939, the note could have been received by petitioner from Paramount without further consideration and for the asking, since it would then have been under his unfettered control and *116 therefore constructively received, but the facts here show that petitioner could have obtained the note, or its cancellation, only on certain conditions prescribed by Paramount with which petitioner was unwilling to comply. We do not know whether the settlement of the note of petitioner for the small amount of $500 by Paramount's wholly owned Management Corporation was induced: (a) by the fact that the statute of limitations ran against the note and would be effective to destroy its value if pleaded by petitioner in a suit on the note; (b) by the fact that the revenue agent proposed to collect from Management Corporation income taxes on accrued interest on the note; or by a combination of those facts and others. However, we do know, that the note was not satisfied or cancelled by the agreement of January 14, 1939 when the collateral securing same was returned to petitioner, or by any other arrangement in that year, and that the note was not finally cancelled and satisfied until petitioner paid $500 therefor in 1942 to Management Corporation in full satisfaction of the note and interest, and we think that under such circumstances our decision must be controlled by Estate of W. R. Whitthorne, 44 B.T.A. 1234, *117 wherein, under basic material facts in no essential respect different from those here, it was held that in the settlement of a secured debt for less than its amount it is not the prior release of property pledged as security for the debt from the lien that constitutes the realization of income, but it is the obliteration of the debt itself. We think the following excerpt from that opinion is an apposite here as it was there, to-wit: The petitioners argue a new conception of the doctrine of realization of income in connection with a debt settlement. They say the essence of the realization is not the settlement of the debts alone, but the freeing of assets, and that such freeing of assets occurred in 1930 when the pledge of the shares was limited by the banks to $100,000. This can not be adopted as the theory of the rule. A solvent taxpayer realizes a gain by a reduction of his debt irrespective of whether the debt is secured by a pledge or mortgage. The freeing of assets which has been regarded in the decisions as a significant fact is not the release of the pledged security from lien, but the effect of enabling the debtor to use all his assets freed from the incubus of the debt. *118 The obliteration of the offsetting liability for debt is what constitutes the gain. The fact that in 1939 petitioner was interested in settlement of the note so as to effectuate the payment of as small an income tax as possible is immaterial under the facts of this case. Cf. Richards v. Commissioner, C.C.A. 2, 150 Fed. (2d) 837, Vol. 5-1945, [*] 72,612, Prentice-Hall. We hold that respondent erred in determining the deficiency. Decision will be entered for the petitioner.