George W. **DRYSDALE** and Jeannette Drysdale, Petitioners,

v.

**COMMISSIONER OF INTERNAL REVENUE**, Respondent.

No. 13983.

United States Court of Appeals
Sixth Circuit.

April 20, 1960.

---

John H. Fildew, Detroit, Mich., for petitioners, Edward G. DeGree and John H. Fildew of Fildew, DeGree, Fleming & Gilbride, Detroit, Mich., on the brief.

Charles B. E. Freeman, Washington, D. C., for respondent, Charles K. Rice, Lee A. Jackson, Robert N. Anderson and Charles B. E. Freeman, Dept. of Justice, Washington, D. C., on the brief.

Before SIMONS, Senior Judge, and MILLER and CECIL, Circuit Judges.

SIMONS, Senior Judge.

This is a petition to review a redetermination by the Tax Court of deficiencies in income tax for the years 1954 and 1955 asserted by the Commissioner of Internal Revenue. The facts involved follow.

The petitioners were cash basis taxpayers and filed joint income tax returns for the years in question. Drysdale, a practical engineer, had been in the employ of Briggs Manufacturing Company since 1926, in charge of production, and subsequently became a director and vice president. Though for a long time in the employ of Briggs, he, on October 1, 1952, for the first time, entered into a formal written employment contract with Briggs. Under it, Briggs was to pay him $1500.00 a month for ten years following termination of his full time activities, or upon reaching the age of sixty five (65). During that period Drysdale obligated himself to serve Briggs in an advisory and consulting capacity and to refrain from accepting employment with, or acquiring an interest in, any activity which was inconsistent with or adverse to the activities of Briggs. Upon the breach of any condition, Drysdale was to forfeit all rights to further compensation under the contract. In the fall of 1953, Briggs negotiated a sale of its automotive and aircraft division to the Chrysler Corporation and a sale was consummated to be effective December 29, 1953. In this situation, Briggs desired to amend petitioner's employment contract and on December 28, 1953 the original contract was amended. Pertinent clauses are printed in the margin.*

---

* "2. Second party, subject to the provisions of Paragraph 4 and 7 hereof, shall serve first party in such * * * capacities as the Board of Directors of first party shall from time to time determine and shall at all times devote his entire business time and attention and exert his best efforts to maintain and promote the business of first party. While so employed second party shall be considered for the purposes of this agreement as engaged in "full time employment."

"4. Either party shall have the option to terminate such full time employment at any time after one (1) full year of full time employment hereunder by written notice given at least six (6) months prior to the effective date of termination. * * * After any termination of full time employment as above provided, employment of second party shall continue hereunder as set forth in Paragraphs 5, 6 and 7 hereof.

"5. In the event such full time employment of second party should terminate prior to his attaining the age of sixty-five (65) years for any reason other than the death of the second party, then second party shall while living but subject to the terms and provisions of Paragraphs 7, 10 and 11 hereof, thereafter be paid monthly an amount (not less than $1,500.00) * * *, such payments

Under its terms, the Briggs' liability was reduced from $180,000 over a ten year period to $90,000 over a five year period. Briggs was to make payment of $1500.00

to start thirty (30) days after termination of such full time employment and to continue for ten (10) years thereafter * * *.

* * * * *

"7. During such period as second party shall be entitled to any payments under the terms and provisions of Paragraphs 5 and 6 hereof, employment of second party shall be in an advisory and consulting capacity and second party shall while living and to the extent physically and mentally capable, consult with first party and advise first party at such reasonable times as first party may request with respect to the business activities and problems of first party and shall not during such period accept any employment * * * (which) * * * might reasonably be expected to be adverse to or inconsistent with that of first party * *.

"8. In the event of the death of second party at any time he shall be receiving payments under either Paragraph 5 or 6 hereof, then first party shall pay to the person or persons designated in Paragraph 12 hereof the sum of $1,500.00 per month for the balance of the ten (10) years during which otherwise the payments under said Paragraphs would have continued.

* * * * *

"10. In the event second party breaches any of the conditions or agreements on his part to be performed, second party shall forfeit all rights to further compensation of any nature to which he may be entitled hereunder.

"11. Neither second party nor any of the persons, except the executor, administrator or personal representative of second party, designated under Paragraph 12 hereof shall be entitled to alienate, commute, encumber, sell, transfer or otherwise dispose of his or their rights to receive the compensation payments provided for herein and such rights are expressly declared non-assignable and non-transferable. Any attempted assignment or transfer shall immediately terminate any further liability on the part of first party hereunder.

"12. All contingent payments which fall due hereunder after the death of second party shall be paid to his executor, administrator or personal representative, or such other person or persons as shall, under the Last Will and Testament of the second party or otherwise, be entitled thereto.

"13. This agreement shall be binding upon and enure to the benefit of the parties hereto, any successors to the business of first party and the heirs and personal representatives of second party, but neither this agreement nor any rights hereunder shall be assignable by second party."

* * * * *

The 1953 Amendment:

* * * * *

"Now, Therefore, in consideration of the performance of the mutual covenants herein contained, it is agreed that said employment contract dated as of October 1, 1952, be and the same is hereby amended and modified by adding thereto, after paragraph 13, the following:

"14. In event first party disposes of its automobile body manufacturing business during the term of this agreement,

"(a) second party's full time employment with first party shall thereupon terminate and second party shall be free to accept other full time employment, including full time employment with the purchaser of such business.

"(b) first party agrees in lieu of all further payments provided for in said contract dated as of October 1, 1952 to pay thereafter to the Trustee for the use and benefit of the second party the sum of $90,000.00 payable in monthly installments of not less than $1,500.00 each month, payable on the first day of each month, commencing one month after the consummation of said first party's disposal of its automobile body manufacturing business to the purchaser and continuing until the full sum of $90,000.-00 without interest, has been paid.

"(c) second party agrees that the payments to be made by first party to the Trustee under the preceding paragraph in this modification of said employment contract shall be in complete compromise, settlement, accordance and satisfaction of first party's obligations under said agreement as of October 1, 1952 and of all other obligations of first party under said employment contract dated as of October 1, 1952; and that while Trustee shall be receiving the payments provided for herein, second party shall perform the advisory and consulting services for first party provided for in paragraph 7 of said agreement.

"15. Trustee agrees to accept said payments in behalf of the second party and to invest and reinvest said sums in United States government bonds and to hold and pay said sum under the following terms and conditions:

a month to a trustee who would hold the money and pay Drysdale $1500.00 a month upon his reaching age sixty five, or upon the termination of full time employment, or to his wife or estate, if he died before reaching sixty five. In addition, petitioner was permitted to work for Chrysler. Except for these amendments, the 1953 contract was to continue in full force and effect. Drysdale became a full time Chrysler employee immediately following the sale to Chrysler and retired in 1957. Briggs turned over to a trustee $16,500 in the tax year 1954 and $18,000 in the tax year of 1955. While Drysdale received nothing from the trustee in those years, the Commissioner contended, and the Tax Court agreed, that these amounts were income to Drysdale during the tax years under the doctrine of constructive receipt.

Drysdale contends that the Tax Court misapplied the constructive receipt doctrine, that there is no evidentiary basis for the Tax Court's finding that Drysdale suggested this amendment solely to defer receipt of income. The Commissioner insists that the constructive receipt doctrine was properly applied and alternatively asserts the economic benefit theory.

Following the sale to Chrysler, Drysdale became its employee, doing the same kind of work he had done for Briggs, and received approximately the same salary. The Tax Court reasoned that Briggs' original thought, as expressed by its officers, was to enter into an amended employment contract with Drysdale providing for monthly payments directly to him. It will be observed, however, that neither in the 1952 contract nor in the 1953 amendments thereto, was there any thought expressed that such payments were to be made prior to Drysdale's reaching sixty five years, his death, or his retirement from full time activity. Not one of these contingencies had occurred when the 1954 or 1955 payments were made to the trustee. Drysdale was not sixty five, he was still alive, and his cessation of full time activity came in 1957 when he retired. That date, and no earlier date, brought into existence the obligation of Briggs to pay Drysdale $1500.00 a month. The only change made by the amendment was the reduction of the period during which such payments were to be made. His 1957 cessation of full time activities then, and then only, matured the Briggs' contractual promise. It is agreed that retirement from full time activity meant just that and not merely retirement from full time activity for Briggs.

■ So far as this record shows, there was no obligation on the part of Briggs to pay any sum, however able and willing Briggs might be, to Drysdale until one of the contractual contingencies arose. However, the Tax Court reasoned that because payments were made to a trustee for the benefit of Drysdale in the tax years, this, and of itself, requires a holding that it was Drysdale's purpose to defer his taxes until some future year when his substantial

"(a) As and when second party attains the age of sixty-five (65) years or when he retires from regular employment requiring full time effort, whichever event first occurs, Trustee shall pay to him from the funds received by it, the sum of $1,500.00 per month until said fund is exhausted.

"(b) In the event second party shall die before attaining the age of sixty-five (65) years or before receiving the full amount of the trust fund, then the Trustee shall pay the same to second party's wife, Jeannette A. Drysdale, in like installments as provided in paragraph (a) above, until the fund is exhausted; if Jeanette A. Drysdale shall die before said fund is exhausted, the remaining balance thereof shall be paid then in a lump sum to her estate;

"(c) For its services, Trustee shall be paid a reasonable fee from the funds held in trust in accordance with its current schedule of fees charged for services in similar matters.

"16. It is mutually agreed that said contract of October 1, 1952 as herein amended shall continue in full force and effect. * * * "

salary ceased because of his retirement. We disagree.

The amended contract was the result of negotiation. There is no record of its content and no evidence of its purpose other than the reduction of Briggs' obligation from $180,000 over a ten year period to the obligation to pay $90,000 over a period of five years instead of ten. Blackwood, president of Briggs, had testified categorically, upon cross examination, that Briggs was willing to pay under the terms of the contract. When asked the question, whether Briggs had any further need of Drysdale's services, after the sale took place, that Briggs was perfectly willing to pay the money to Drysdale, his response was: "I would say yes, provided we could control his services." Such services could only mean services under the amended contract, after retirement, or reaching the age of sixty five. Such control could effectively be exercised by a trustee under its obligation as signatory to the '53 amendment.

The Tax Court relies for its conclusion that payments to the trustee constituted constructive receipt of income largely upon Williams v. United States, 5 Cir., 219 F.2d 523. The facts in the Williams case essentially differ from those here found. In the Williams case, the taxpayer had accepted a bid for the sale of land from a purchaser who desired and offered to pay the full purchase price. The taxpayer was then in constructive receipt of income because the purchaser was ready to pay the entire purchase price in cash. The undisputed facts were that after the bid for the land was accepted Williams, of his own volition, devised an escrow agreement and by it imposed upon himself limitations binding him as to stated amounts and for stated periods not to take within his control and disposition and make fully available to himself the full purchase price which, except for the self imposed limitation, would have been fully and completely his to do with as he pleased.

Rather does the present case fall within the ambit of Commissioner v. Oates, 7 Cir., 207 F.2d 711. In that case the taxpayers, who were general insurance agents, modified their contract with the insurance company shortly before they retired. Instead of receiving renewal premiums during their retirement when received by the company, they were to receive them in equal installments over a fifteen year period, so as to prevent the premiums from "bunching together" during the early retirement years. The Court held that the parties merely relieved an unsatisfactory arrangement by negotiating a novation of their contract. The taxpayer in the instant case, like in Oates, never reduced anything to their immediate possession or present enjoyment. The 1952 contract, in view of the pending negotiations with Chrysler, proved unsatisfactory to Briggs because Briggs wanted its liability reduced. It also was a restriction upon Drysdale because he could not work for Chrysler. The parties negotiated an amendment to remedy this situation. At no time did the petitioner have any right to the immediate possession or enjoyment of anything. The amounts paid by Briggs to the trustee in 1954 and 1955 were not constructively received by Drysdale since he had no legal right to require the payment in those years. Glenn v. Penn, 6 Cir., 250 F.2d 507.

The Commissioner undertook to prove by witnesses subpoenaed from the Briggs company that Drysdale himself had suggested the intervention of a trustee and the Tax Court relied upon them to reach the conclusion that Drysdale had suggested or demanded the trustee arrangement and that it had no purpose other than to permit Drysdale to reduce his taxes but the proof failed. Blackwood, who did not participate in the negotiations, sought to rely upon certain assumptions, but was promptly checked by the tax judge who excluded this purported evidence and it was stricken from the record, even before it had been developed.

418

As an alternative ground for supporting the Tax Court's decision, the Commissioner asserts the economic benefit or cash equivalent theory. Under this doctrine, any economic or financial benefit conferred upon an employee as compensation is considered the equivalent of cash and taxable in the year when made. The Tax Court undertook no discussion of this theory except to refer to the case of Sproull v. Commissioner, 6 Cir., 194 F.2d 541. In that case, the trust agreement contained no restriction whatever on petitioner's right to assign or otherwise dispose of the interest created in him. In the present case, the taxpayer is restricted by the terms of both contracts from exercising any dominion over the funds in possession of the trustee. This is a crucial distinction. See Commissioner v. LoBue, 351 U.S. 243, 76 S.Ct. 800, 100 L.Ed. 1142. The distinction is noted in the Tax Court's opinion in that case. We see no purpose of further discussion of Sproull.

Reversed and remanded for further consideration not inconsistent with this opinion.