IN THE MATTER OF THE TRUST ESTATE CREATED AND ESTABLISHED BY DEED OF TRUST OF HENRY D. MOORE, DATED MAY 10, 1918.

Argued March 21, 1967—Decided August 1, 1967.

138

134

*Mr. Charles A. McGeary* argued the cause for plaintiffs-appellants Gilbert H. Moore and Camden Trust Company, surviving trustees (*Messrs. Bleakly, Stockwell & Zink,* attorneys).

*Mr. Robert F. Garrett, III* argued the cause for defendants-respondents William Allen, Jr., Telford Moore Allen, David Moore Allen and Bert Moore Allen.

*Mr. George H. Hohweiler* argued the cause for defendant-respondent Samuel P. Orlando, guardian *ad litem* for all minor and unascertained contingent beneficiaries, attorney *pro se.*

The opinion of the court was delivered by

HALL, J. This litigation challenges the amount of *corpus* commissions allowed by the Camden County Court, Probate Division, on the settlement of the fourth intermediate account of the trustees of an *inter vivos* trust. The *corpus* has always exceeded $100,000 and the administration of the trust has already extended beyond 25 years. The Appellate

Division, on the appeal of certain of the beneficiaries, decided that the allowance had been improperly computed, vacated it and remanded the matter to the trial court to make a new award in conformity with guidelines laid down in the opinion. The court also set out guidelines for the computation of final commissions upon the eventual termination of the trust. 91 *N. J. Super.* 321 (1966). We granted the trustees' petition for certification. 48 *N. J.* 144 (1966).

We are in complete accord that the basis and method of computation were legally wrong and thus that the amount of the allowance was grossly excessive, dictating the disposition the Appellate Division made. While in most respects we agree with the guidelines set forth, we think we should restate them. We are moved to this course by reason of the paucity of prior expression by this court and of fairly recent statutory changes. Earlier judicial opinions at various levels, not entirely consistent and principally involving prior versions of statutory provisions, are not currently of great help to trial judges or the bar in a field where the statutes are quite imprecise in many particulars, most applications for commissions are not questioned for various reasons, and practices may well have grown up which are neither uniform nor fully conforming to the views we hold. Since this is a non-testamentary trust and the instrument does not provide for the compensation of the trustees, the sections of *Chapter* 10 of *Title* 3A supplementing *Revised Statutes* (1937) which deal with the commissions of other fiduciaries specified therein, are applicable. *N. J. S.* 3A:10–4. Therefore what we have to say is pertinent to such other fiduciaries as well.

The current form of the pertinent chapter provisions dealing with the allowance of *corpus* commissions reads as follows:

"*N. J. S.* 3A:10–1. *Allowance in general*

Allowance of commissions on corpus in excess of $100,000 to executors, administrators, administrators with the will annexed, guardians, trustees under a will and fiduciaries appointed under chapter 40 of this Title for the property of an absentee, shall be made with reference to their actual pains, trouble and risk in settling the estate, rather than in respect to the quantum of the estate."

"*N. J. S.* 3A:10-2. *Computation of commissions; rates*

On the settlement of accounts of fiduciaries acting in any capacity referred to in section 3A:10-1 of this Title, their commissions over and above their actual expenses shall be computed upon the following rates:

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

If there is but one fiduciary, 5% on all corpus that comes into the fiduciary's hands in cases where corpus receipts do not exceed $100,-000.00, and in cases where corpus receipts exceed $100,000.00, 5% on the first $100,000.00 of corpus, and, on the excess over $100,000.00 of corpus, such percentage, not in excess of 5%, as the court may determine on the intermediate or final settlement of the fiduciary's accounts, according to actual services rendered. If there are 2 or more fiduciaries, their commissions on corpus shall be the same as herein provided in the case of one fiduciary, and, in addition thereto, the court may allow corpus commissions in excess of the commissions to which one fiduciary would be entitled under this section, at a rate not exceeding 1% of all corpus for each additional fiduciary. In any case in which the administration of the fiduciary or fiduciaries has extended or extends beyond a period of 25 years, corpus commissions for such additional years shall be allowed at a rate not exceeding 1/5 of 1% per annum, irrespective of the number of fiduciaries.

To aid a full understanding of this statutory scheme, some brief reference should be made to history. Originally the sole provision was the precursor of *N. J. S.* 3A:10-1. In existence at least since 1820, *Rev.* 1820, *p.* 786, § 31, that enactment said only that "\* \* \* the allowance of commissions to executors, administrators, guardians or trustees, shall be made with reference to their actual pains, trouble and risk, in settling such estate, rather than in respect to the quantum of estate, \* \* \*"

Any further provision apparently did not come until *L.* 1855, *c.* 128, *p.* 345, § 9 and *L.* 1862, *c.* 29, *p.* 41 (*Rev.* 1877, *p.* 776, § 110), when the method which has developed into the quoted portion of *N. J. S.* 3A:10-2 was adopted. Since the provisions of the 1862 statute were continued, save for minor changes, in the Orphans Court Act of 1898 (*L.* 1898, *c.* 234, *p.* 762, § 129; 3 *C. S. p.* 3860) and *Revised Statutes of* 1937, we summarize them by reference to *section* 3:11-2 of the latter. It provided that commissions of specified fiduciaries where the estate receipts did not go beyond $50,000 should

not exceed a designated scale of percentages "[o]n all sums that come into their hands." 5% was the maximum allowed on the first $10,000 of receipts, 4% on the excess between $10,000 and $20,000 and 3% on the excess between $20,000 and $50,000. Where the receipts exceeded $50,000, a single maximum percentage of 5% of "all sums which come into their hands" was specified, the exact figure to be determined by the court "on the final settlement of their accounts according to the actual services rendered."

The first essential of the scheme thus laid out was that the dollar amount of *corpus* commissions awarded by a court as compensation for the administration of any estate, whether an executorship, trusteeship or whatever, was to be arrived at by the application of a percentage to a prescribed base. This basic format has never been changed. The base continues to be "all sums which come into their hands" or "receipts," terms which are synonymous and refer to the gross estate received by the fiduciary at commencement plus gross increases during the course of administration. See 7 *N. J. Practice (Clapp, Wills and Administration* (3d ed.)) § 1527; *In re Linn,* 124 *N. J. Eq.* 65, 69 (*E. & A.* 1938); *Appleby v. Appleby,* 140 *N. J. Eq.* 8, 12 (*Ch.* 1947); *Blauvelt v. The Citizens Trust Co.,* 3 *N. J.* 545, 558–559 (1950). The rate to be applied was originally entirely permissive with the court, limited only by *maxima* and by the standards of "according to the actual services rendered" and "with reference to their actual pains, trouble and risk * * * rather than in respect to the quantum of estate."[1]

---

[1] While this litigation does not involve the matter of income commissions, the statutory provisions with respect thereto may be noted. Originally (3 *C. S., p.* 3860, § 130), allowance of commissions on income from property held in trust was authorized, upon any accounting, either intermediate or final, at a rate not exceeding 5% as the court "shall deem just," considering "the actual pains, trouble and risk of such accountant * * *" Income received during an estate administration from property not directed to be held in trust was apparently included with *corpus* receipts for commission purposes. By *L.* 1939, *c.* 134, an additional paragraph was inserted in *R. S.* 3:11–2 mandatorily fixing commissions on *all* income coming into the hands of fiduciar-

A succession of amendments since 1937 to what is now *N. J. S.* 3A:10–2 has resulted in a single mandatory rate of 5% of gross *corpus* receipts where such receipts do not exceed $100,000, without regard to pains, trouble, risk or actual services rendered, the length of time the administration required (short of 25 years) or the length of the period thereof during which the fiduciary held all the gross receipts comprising the base. In cases where such receipts exceed $100,000, the 5% rate applies mandatorily to the first $100,000, with that on the excess to be determined by the court at a percentage of not more than five under the original standards. See *L.* 1939, *c.* 134; *L.* 1949, *c.* 225; *L.* 1951, *c.* 345 (enacting *Title* 3A); *L.* 1957, *c.* 80. See 7 *N. J. Practice, supra,* § 1525, *p.* 221, *n.* 4.; *In re Flynn,* 132 *N. J. Eq.* 85 (*Prerog.* 1942); *The National State Bank of Newark v. Nadeau,* 57 *N. J. Super.* 53, 69–70 (*App. Div.* 1959).

Recognition of the length of time an estate administration requires first came into the statute by *L.* 1940, *c.* 172. The 1940 amendment simply said that commissions in excess of the rates set forth in the statute "may be allowed * * * in any case where the administration of the fiduciary has extended or extends beyond a period of twenty-five years". In 1949 a further amendment placed a limitation on such excess rate at not more than 1/5 of 1% *per annum* for the additional years beyond 25. *L.* 1949, *c.* 225. By *L.* 1957, *c.* 80, the phrase "may be allowed" was changed to "shall be allowed," but the mentioned rate remained as an outside limit and was not made mandatory. It is evident that this additional authority is without regard to the nature of the estate or the amount of gross receipts involved, that it authorizes an over-all rate larger than 5% of total gross

ies at 5% thereof and permitting the same to be taken "as of the time or when the income was or is received * * * without allowance thereof by the court." This provision remains today in *N. J. S.* 3A: 10–2, except that the rate has been raised to 6%. *L.* 1957, *c.* 80; *L.* 1964, *c.* 25.

receipts where the administration extends beyond 25 years, and that it was intended to be retroactive.

One other special statutory provision should be noted, which is also slightly involved in this case. Until 1949 no recognition was given to the number of fiduciaries serving, *i. e.*, as far as the statute stated, it made no difference in the rate of commissions whether the estate had one fiduciary or more than one. By *L.* 1949, *c.* 225, it was provided that if there were more than two fiduciaries, the court might allow commissions in excess of 5% at a rate not exceeding 1% for each fiduciary beyond two. By *L.* 1957, *c.* 80, this permissive authority was extended to situations where there are two or more fiduciaries, authorizing the additional maximum of 1% for each fiduciary beyond one. The statute so remains today. However, it was made plain in both enactments that the authority applies only with respect to the first 25 years of administration and may not be utilized thereafter.

█ █ The second essential of the commissions scheme in this State is the implicit one that, save in a couple of exceptional situations, commissions are to be fixed only at the termination of the administration, *i. e.*, on the final accounting of the fiduciary, when his work is completed, his over-all performance and the full course of the estate can be judged and evaluated and the statutory provisions and other pertinent factors properly applied. Indeed, prior to 1939 the statutory sections referred specifically only to allowance of commissions on final accounts and did not mention intermediate accounts (except *R. S.* 3:11–3 dealing with commissions on income from property held in trust; see footnote 1). There was some doubt, therefore, whether any *corpus* commissions could be allowed on an intermediate account. See, *e. g. In re McMillin,* 120 *N. J. Eq.* 432 (*Ch.* 1936) ; *Gates v. Plainfield Trust Co.,* 123 *N. J. Eq.* 519 (*Ch.* 1938) ; *cf.* 7 *N. J. Practice, supra,* § 1533, *p.* 234, *n.* 5. *L.* 1939, *c.* 134 settled any question by including the reference to intermediate accounts now found in *N. J. S.* 3A:10–2. *Commercial Trust Co. v. Barnard,* 27 *N. J.*

332, 346 (1958). But the section has never gone beyond this bare mention and, while the general statutory standards and the outside limitations of rate undoubtedly apply, the matter of more detailed criteria to govern the extent to which *corpus* commissions should be allowed intermediately is a matter for judicial decision. It is clear that the correct thesis of intermediate commissions has always been simply an award of some interim, on account compensation, within conservative limits and with full regard for all which may transpire before the administration is completed, in order to give some limited measure of present recompense to the fiduciary for time, effort and overhead. It follows that they should not be allowed on the basis of payment in full for fiduciary services during the particular accounting period or to the closing date thereof. This is the true meaning of this court's statement in *Commercial Trust Co. v. Barnard, supra* (27 *N. J.*, at *p.* 346) that "* * * a trustee entitled to commissions on corpus may claim an *appropriate* portion at the time of an intermediate accounting and is not required to wait until the termination of the trust" (emphasis added). See also *In re McMillin, supra* (120 *N. J. Eq.* 432); *Blauvelt v. The Citizens Trust Co., supra* (3 *N. J.*, at *pp.* 558–559); *In re Cox*, 21 *N. J. Super.* 287 (*Ch. Div.* 1952); *In re Armour's Estate*, 40 *N. J. Super.* 177, 180 (*App. Div.* 1956); *In re Estate of Higgins*, 61 *N. J. Super.* 291 (*Cty. Ct.* 1960).[2]

[2] A necessary exception arises in the case of the perpetual charitable trust where, because it will ordinarily never terminate, full compensation, or nearly so, should probably be allowed on each accounting. See *In re Sparks*, 135 *N. J. Eq.* 300 (*Prerog.* 1944).

Another situation calling for some liberalization is where the sole or a co-fiduciary dies or resigns before completion of the administration. An accounting after such an event is intermediate as to the estate, but final as to such fiduciary in the matter of approval of his performance and in the sense that he cannot thereafter be awarded further commissions. The latter factor may well be taken into some account, giving due allowance, however, to the fact that generally a substituted fiduciary will have to be compensated for completion of the work which the one resigning or dying had assumed but did not consummate, voluntarily or involuntarily. See *In re Higgins, supra* (61 *N. J. Super.* 291). (Where one or more fiduciaries remains, the mat-

■ We are certain that what we have just said is not altered by the fairly recent statutory amendments providing for a higher rate of *corpus* commissions where the administration extends beyond 25 years. Although the language is somewhat awkward, we construe it to intend no more than to authorize a higher over-all rate in such event, to be fixed at termination, than that which would be allowed if the administration consumed less than 25 years. We do not understand it to set up two distinct periods for commission purposes, one covering the initial 25 years and the other the balance, with commissions for the first period "semifinally" fixed, so to speak, at the end thereof and those for the second period separately determined at the final termination of the estate. See *In re Cox, supra* (21 *N. J. Super.* 287). The Appellate Division's opinion in this case, especially in guidelines (1) and (2) for computation of final commissions (91 *N. J. Super.,* at *p.* 332), might be read to express the opposite view. If so, we think it is incorrect.

Returning to the matter of fixing final commissions where the exact rate is permissive within a specified maximum, it is apparent that the statutory standards of services rendered and pains, trouble and risk, as opposed to size, are very general. More precise factors and considerations to be applied in implementation to arrive at a proper rate must be determined judicially. In outlining such factors and considerations, we are referring particularly to those pertinent to an estate, as in the case at bar, in which gross *corpus* receipts exceed $100,000 (as to the excess over that figure) and the administration extends beyond 25 years.[3]

---

ter may be more one for appropriate apportionment of commissions then allowed. See *N. J. S.* 3A:10-6.) It should be paramount, none the less, that beneficiaries of the estate ought not be subjected to larger commissions overall or their interests be put to greater risk merely because a fiduciary does not complete his administration.

[3] It may also be noted that the same factors and considerations apply where the administration of an estate of such size does not last longer than 25 years. In a situation where the gross *corpus* receipts never exceed $100,000 and, as has been indicated, the 5% rate is man-

■■■ The object is, of course, to award the fiduciary just and adequate compensation on the basis of actual pains, trouble, risk and services rendered during the entire administration by the application of a selected rate to the base. *Blauvelt v. The Citizens Trust Co., supra* (3 *N. J.*, at *p.* 559). The rate is the variable. While the maximum authorized by the statute at the time of the allowance is "controlling" (*The National State Bank of Newark v. Nadeau, supra* (57 *N. J. Super.*, at *p.* 69)), where the rate has been increased by statutory amendment during the course of administration, the over-all rate selected should reflect consideration that a lower authorized percentage was in effect during a substantial portion of the administration, in cases where that is the fact, rather than merely in effect automatically applying the maximum rate in effect at termination to the entire period. "Pains, trouble and risk" are difficult to define precisely and to translate into an appropriate percentage rate. While the *quantum* of the estate is not to govern, size may affect the extent of the risk. The chief concern ought to be with the services rendered, their extent, difficulty and quality, and the fiduciary's conscientiousness and performance. See 7 *N. J. Practice, supra,* § 1525, *n.* 7, § 1532.

■ We have earlier said that the selected rate is to be applied to the statutorily prescribed base,—the gross estate received at inception plus gross increases. The figure is customarily the total of such gross receipts during the administration (apart for the moment from the matter of the valuation to be utilized in reaching the figure). *Blauvelt v. The Citizens Trust Co., supra* (3 *N. J.*, at *p.* 559); *In re Estate of Higgins, supra* (61 *N. J. Super.*, at *p.* 296). But again, where the rate is permissive and variable, in

datory with respect to the first 25 years of administration, the same factors and considerations as in the case of an estate exceeding $100,-000 will, in general, also enter into the fixing of the higher over-all rate where the administration extends beyond 25 years. Special problems may arise, however, in mandatory rate situations.

fixing it consideration must be given to the length of time this total figure was administered by the fiduciary. Where a good proportion represents assets distributed or disbursed during the course of administration or assets received substantially after inception, it is quite wrong to fix a rate as if the total figure constituted receipts in the hands of the fiduciary throughout. The rate should be lowered to compensate.

The matter of valuation of gross receipts on a final accounting for commission purposes deserves particular mention. Since 1941, the accountant is required to annex a schedule setting forth a full list of the investments and assets in hand, together with the inventory or acquisition value (book value for which the accountant has charged himself) and the value as of the day the account is drawn, as well as a statement of all changes made since acquisition or the last account. The present rule so requiring is R. R. 4:106–2. The commission statute, N. J. S. 3A:10–2 and its predecessors, has never referred to the question of valuation of "all sums that come into their hands" and "receipts"; it certainly does not require the use of current market value and might well be said to contemplate only inventory or acquisition value. But the utilization of current market value has become of increasing importance in the last two or three decades by reason of the inflationary spiral of values and costs. Perhaps this is due in some measure to the fact that a fiduciary is liable for the actual value of the estate's assets, no matter at what figure he has charged himself on his books, and so his compensation ought to be calculated accordingly. In any event, it has come to be generally recognized in the cases "* * * that the rate of commission is to be calculated upon the value of the principal at the time the compensation of the trustees is fixed * * *", at least as to final accounts. *Appleby v. Appleby, supra* (140 *N. J. Eq.,* at *p.* 12). Such an accounting presupposes a termination of administration and distribution, so that, as far as the fiduciary is concerned,

there can be no further possibility of decrease in the then market value.

But the rule is not a hard and fast one. The time during the administration when the values increased has to be taken into account and where the increase has existed only during a fraction of the period, the rate should be calculated downward accordingly. In other words, an increase in value at the late stages of an administration should not be related back to inception, and it is the accountant's obligation to present to the court the facts with reference to the time and amount of value increases claimed. Likewise, it has become quite generally and soundly accepted that where a substantial increase in value is in no sense attributable to the efforts of the fiduciary, but only to the universal effects of inflation, "* * * the rate of commission allowed should * * * be lower than if calculated upon inventory values". *Appleby v. Appleby, supra* (140 *N. J. Eq.*, at *p.* 12).[4]

Finally, on the subject of final commissions, it should be noted that from the figure for the entire administration arrived at by the application of the rate selected to the proper base in accordance with the principles outlined is to be subtracted the sum of all commissions intermediately allowed, to obtain the amount to be paid the fiduciary on the completion of his task.

A word more should be said about appropriate factors and considerations in arriving at an appropriate rate for commissions on intermediate accounts, keeping in mind the thesis that such allowances are only some on account compensation to be conservatively allowed for services during the particular limited accounting period. (Here a rate is never mandatory, even where the estate does not exceed

---

[4] One of the special problems in mandatory rate situations, adverted to in footnote 3, which occurs to us is the propriety of using current market values without some kind of adjustment where such values have existed for only a portion of the period of administration. We see no reason why the principle outlined above should not also apply where the rate is mandatory.

$100,000, but we are speaking primarily of an estate larger than that figure). The court has to judge the probable total length of administration, the general nature and extent of the services rendered and expected to be rendered, and whether it is likely maximum commissions or nearly so will be allowed on final accounting. While it must take into account what was allowed previously, if the accounting is not the first one, it does not properly do so by computing commissions on the full period of administration to date and then subtracting what may have been earlier awarded. That method is appropriate, as we have pointed out, on the allowance of final commissions only and any contrary thought in the Appellate Division opinion (91 *N. J. Super.*, at *p.* 330) does not, in our opinion, represent the correct practice. As to other factors and considerations, the cases cited in our earlier discussion of this phase all stress that the court, in arriving at a fair rate within the applicable statutory limitation for the particular administration period involved, must take into account, *inter alia,* that future services, including winding up, may be greater than those previously rendered, that there may arise the necessity for a substituted fiduciary who has to be fairly compensated for his work, that the then assets may depreciate in the future even below acquisition value and that other presently unforeseen events might transpire which would affect the final commission rate.

The base to be utilized is essentially the same as on final accounting, *i. e.,* the highest gross receipts total during the accounting period, subject, however, to the same considerations mentioned in our earlier discussion of that subject. While it seems clear enough that current market value may be an element in fixing commissions intermediately, we agree with the view of the Chancery Division in *In re Cox, supra* (21 *N. J. Super.*, at *p.* 288) that "* * * it is not especially persuasive for the allowance of unusually large commissions." See also *In re Estate of Higgins, supra* (61 *N. J. Super.*, at *pp.* 296–297). Indeed, it is quite risky, for there can be a decrease in such value before termination of the administration

through no chargeable fault of the fiduciary. In addition, an accountant is free to choose the date of closing of an intermediate account at a time when market values of the assets are high.

It is frequently said that "[T]he fixing of *corpus* commissions * * * is a matter left to the court's discretion * * *," which will be set aside only where there has been an abuse. *The National State Bank of Newark v. Nadeau, supra* (57 *N. J. Super.,* at *p.* 70). This is certainly true insofar as the determination of rate is concerned if it is evident that the court reached that determination on the proper legal approach and with due appreciation and consideration of all the legally significant factors. *Cf. State v. Daniels,* 38 *N. J.* 242, 249–250 (1962). If it did not, it is not a question of abuse of discretion, but rather one of more fundamental error. The trial court's obligation is to fully examine a request for commissions and fix compensation in a fair and adequate amount after application of the principles and guidelines we have set forth, although parties in interest do not object or even consent to the amount requested by the fiduciary. *Cf. In re Simon,* 93 *N. J. Super.* 579, 585–586 (*App. Div.* 1967). And he should clearly spell out in the judgment or otherwise on the record, for the assistance of a reviewing court and of other trial court judges in any future proceedings in the same matter, how and why he arrived at the rate, the base and the amount of commissions allowed.

There remains to relate the guidelines we have spelled out to the case at bar. In this connection, we have examined the originals of the four intermediate accounts to date and the judgments thereon as well as the appendix furnished by the parties. The trust estate was created by a deed of trust made in 1918 for the benefit of four of the settlor's grandchildren who were the offspring of a deceased son. The assets came from four sources, designated in the instrument as groups: securities in the hands of the settlor; securities in the possession of his broker; the settlor's interest in another estate;

and the settlor's interest in a personal investment corporation then in the course of liquidation.

The specified pattern of benefits, to the extent pertinent, was a division of the total *corpus* into two equal parts. One half, which represents the trust as it exists today and has for more than the last three decades, was directed to be held until the death of the last survivor of the four grandchildren. Until such event, the income was to be divided equally among them, "in each case, the widow, husband and next of kin taking the ancestor's share," and upon the event, "principal and accumulated interest, if any, shall be divided among such persons as said [grandchildren] may respectively by last will and testament appoint, and in the absence of appointment then as real estate belonging to said children under the laws of New Jersey." The other half was to be distributed, at the option of the trustees, on July 12, 1920[5] at the earliest or, at the latest, as each grandchild attained 30 years of age, with income paid to or applied for the benefit of each until distribution of the principal.

It must have been evident from the outset that the trust (as to the half directed to be held until the death of the last surviving grandchild) would almost inevitably continue for a very long period of time, as it already has. The death of the first grandchild did not occur until after the filing of the present account.[6] The other three still survive. The co-trustee Gilbert H. Moore is one of them. At the time the present ac-

---

[5] This date is that at which the youngest of the four grandchildren would attain majority. See *Moore v. Moore*, 137 *N. J. Eq.* 314, 323 (*Ch.* 1945), earlier litigation involving the validity of attempted anticipation and assignment of income by one of the four grandchildren.

Originally there were three trustees. The third died in 1921. The instrument contains no provision for the appointment of substituted or successor trustees.

[6] This grandchild did not appoint the disposition of her share by will; her four children are the defendants-respondents William Allen, Jr., *et al.*, who objected to the requests for commissions after their mother's death in which position they were subsequently joined by the previously appointed guardian *ad litem* for all minor and unascertained contingent beneficiaries.

count was allowed by the trial court, he was 69 years of age. The ages of the other two are not found in the record. (The settlor himself died many years ago.)

Only the first two groups of assets were received by the trustees at inception. These securities comprised the figure of $511,770 shown in the record as the book and market value at the creation of the trust. See table, 91 *N. J. Super.*, at *p.* 326. About 60% thereof was composed of common and preferred stocks of three tobacco products companies, American Snuff Company, George W. Helme Company (now Helme Products, Inc.) and Weyman-Burton Company (now United States Tobacco Co.). In the trust indenture the settlor, while stating that these stocks would not ordinarily be considered proper investments for trust funds, very strongly advised the trustees to retain them as part of the principal of the trust fund. This precatory admonition has been followed by the trustees and these securities in their present form now make up, as shown by the account before us, about the same percentage of the book value of the current assets and better than 70% of the present market value thereof, as well as accounting for three-quarters of the claimed increase in value from the inception of the trust to the closing of this account.

The other two groups of original assets were received by the trustees in dribs and drabs—partly in cash and partly in securities, including some more tobacco stocks—over the years until 1936.

The trustees did make distribution of half of the trust *corpus* as of July 12, 1920. As far as can be divined from the first intermediate account (the inadequacy in form and the general incomprehensibility of which were very properly adverted to by the Appellate Division, 91 *N. J. Super.*, at *p.* 329), this distribution was made in large part from the last two groups of assets and, while there was a very substantial distribution made in 1920, it was not actually completed until the last receipts therefrom in 1936. Almost immediate distribution was made as each receipt came to hand between 1920 and 1936. There has been no *corpus* distribution since. Thus,

one half of the trust was completely terminated by 1936, with a large portion thereof passing out of the hands of the trustees as early as 1920.

It is also apparent that, as to the other half to be held until the death of the last surviving grandchild, which as we have said constitutes the trust estate presently involved, the trustees allocated from the beginning the securities received at inception from the first two groups of assets, particularly the tobacco stocks, and have continued that allocation throughout. It is, for all practical purposes, impossible to tell from the first intermediate account the accurate amount of total *corpus* receipts or the exact dollar amount of *corpus* distributed to make up the one half, but there is enough shown in subsequent proceedings, as we will shortly indicate, to ascertain at least the minimum amount of distributions and so a figure of total *corpus* receipts can be derived, which at this late date will have to be taken as binding on all parties though it may be somewhat incorrect.

This first intermediate account, filed in 1942, ran for approximately 24 years from the date of the trust instrument. It showed *corpus* on hand at the closing date (representing, as has been indicated, the half of the trust to be held until the death of the last surviving grandchild) having a book value of $579,972 and a market value only about $4,700 higher. *Corpus* commissions were allowed in the decree in the amount of $21,562.38, with no explanation anywhere as to how they were computed. The figure turns out to be, however, 2½% of $862,495.33, a sum set forth in the trustees' application for commissions on the second intermediate account as "net corpus as shown by first intermediate account." We cannot find this sum in the first account, but it will have to be accepted, as the parties seemingly have done, as the amount of gross *corpus* receipts in both halves of the trust during the first accounting period. Subtracting $579,972, the book value of *corpus* held at the end of the first accounting period, from that figure leaves $282,523.01, which will have to be taken for want of anything better as the amount of the distributions

between 1920 and 1936 constituting the other half of the trust estate, even though the sum would appear to be considerably less than 50% of the total.

At the time the first account was allowed in 1942, *R. S.* 3: 11-2, as amended by *L.* 1940, *c.* 172, provided that *corpus* commissions in excess of the 5% rate may be allowed where the administration has extended or extends beyond 25 years. In allowing a 2½% rate, the court must have had in mind that the trust had already extended 24 years and obviously would continue many more. While it is impossible to be sure, it can be surmised that the court also took into account that the gross *corpus* receipts base figure previously mentioned had not been administered for the full 24 years because of the 1920-1936 distributions. Therefore, it cannot well be said at this date that there was any basic legal error in the computation or rate of commissions allowed on the first account.

 It is quite a different story, however, as to the allowances on the second, third and present accounts. The details are set forth in the tables in the Appellate Division opinion, 91 *N. J. Super.,* at *pp.* 327-328, taken from the trustees' applications filed at the time. We make mention of errors with respect to the second and third accounts not only because the same method was followed in the instant fourth proceeding, but also by reason of the effect thereof on the implementation of the guidelines when final commissions are fixed on the termination of the trust and even with respect to future allowances of intermediate commissions.

The second intermediate account covered the administration from 1942 to September 30, 1949. The application for commissions, however, stated that the amount requested did "not take into consideration any due after 25 year period, which period ended in 1943". The account itself showed no *corpus* receipts between the closing date of the first account and the 25th anniversary date of the trust. It may be noted that by the time this account was filed *L.* 1949, *c.* 225, had become effective, limiting the excess rate for administration beyond 25 years to 1/5 of 1% *per annum* for

such additional years. The quoted statement, in the light of 'the computation of the request (91 *N. J. Super.*, at *p.* 327) at the full 5% rate, would indicate the real object of the application was to "sew up" maximum 5% commissions for the first 25 years of administration. The computation though is actually otherwise, since it includes in the base additional *corpus* receipts during the balance of this accounting period (which represent only gains over acquisition value on sales of assets, as do also the additional *corpus* receipts shown in the commission applications on the third and fourth accounts). The commissions actually allowed were computed at the maximum 5% rate for 25 years on the original base of $862,495.33, plus receipts during the accounting period, without any allowance for the fact that $282,523.01 had been distributed years previously. From the total figure there was subtracted the commissions allowed on the first account to make the total awarded $21,848.48. The legal error is obvious in the light of the guidelines for intermediate commissions earlier set forth. The base should have been, on the thesis of book value, $562,995, shown by the account as the total assets administered during the period. The rate applied thereto to arrive at the commissions to be then allowed should not have exceeded 1/5 of 1% *per annum* for the slightly less than seven years of the accounting period, even though the first 25 years ended during the period. (A higher figure would, of course, result if the market value of $727,764 were given consideration).

Commissions allowed on the third intermediate account covering the period from the end of the second account to September 8, 1958 were computed in essentially the same erroneous manner. 91 *N. J. Super.*, at *p.* 327. The same original base was used plus additional receipts during the second and third accounting periods, although the account shows the trustees handled only $512,192 of *corpus* during this period. The maximum rate was applied to that figure— 5% for the first 25 years and 1/5 of 1% per year thereafter. Further, an additional 1% of the total base was allowed,

amounting to over $8,700, because there were two fiduciaries. This was also completely wrong, as the Appellate Division pointed out, 91 *N. J. Super.*, at *p.* 332. The statutory amendment permitting an additional 1% in commissions in such a situation, but during the first 25-years only, was not enacted until 1957, long after the 25-year period expired in this case, and so can have no application here. From commissions so computed, those awarded on the first two accounts were subtracted to give the excessive and legally unsupportable allowance of $35,812.74 for about eight years administration of gross assets having a book value of $512,-192 and a market value at the end of the period of $939,059.

The computation on the present account, 91 *N. J. Super.*, at *p.* 328, followed the same incorrect pattern, but even more astoundingly. The account covered a little less than six years, from September 1958 to July 1964. The gross *corpus* handled, including additional receipts, amounted at book value to $477,264 and to $1,181,361 at market as of the closing date (to which latter figure would be added $11,677.40 representing disbursements — losses on sales — during the period). The same original base was used to which were added receipts during the second, third and fourth accounting periods. Market value was taken into account for the first time by also adding in $715,744, which was the difference between $1,181,361 market value of the assets at the close of the accounting period and the $465,586 book value thereof as of the same date. The grand total was then multiplied by the maximum commission rate of 5% for 25 years and 1/5 of 1% *per annum* thereafter, from which product the commissions allowed on the first three accounts were subtracted to give the rounded figure of $68,000 awarded by the judgment under appeal. The effect was not only to allow intermediate commissions at the maximum rate on a base which included $282,523.01 distributed more than 30 years before, but even more improperly present market values of current assets were related back to the inception of the trust in 1918 as if such assets had been

worth that much then and ever since. The allowance is so obviously wrong that no more need be said.

The Appellate Division was therefore unquestionably correct in vacating it and directing a new award to be made, limited to a base of *corpus* administered during the accounting period and a rate not in excess of 1/5 of 1% per year thereof, with due regard to the intermediate nature of the accounting. 91 *N. J. Super.*, at *pp.* 330–331. This means with proper consideration of and giving allowance to the various factors we have previously mentioned as guidelines for such a situation, which will undoubtedly result in arriving at a rate appreciably lower than the maximum. The court may use as the base total gross assets in hand during the period either at book value or market value. It may be noted that, if the latter is utilized, the present record does not indicate when during the period the increase in value occurred. More importantly, there is nothing to show that such increase was due to the efforts and services of the trustees as distinct from the almost automatic effect of general inflation. Much was made in the commission application and in the trial court's conclusions of the fact that the individual trustee rendered exceptional service by sitting as a director of one of the three tobacco companies, the stocks of which form so large a part of the portfolio, from 1937 to 1957. The intimation was that this had something to do with at least the increase in value of the stock of the corporation he served. It does not appear on the present record, however, that that stock increased in value in greater proportion than the securities of the other two corporations. The trustees' contention that the individual trustee might not, by reason of his age, survive until the fifth account as a reason for large commissions on the present account may also be noted. We do not conceive this possibility to be a proper consideration in awarding intermediate commissions. Moreover, he well knew when he accepted the trusteeship that, by virtue of the terms of the trust, he could not survive until its termination and he must be held to appreciate that by reason thereof his commissions, beyond conservative *ad interim*

compensation, cannot properly be fixed and satisfied until after his death.

When the trust is terminated and commissions are fixed for the entire services of the trustees, the court will apply the applicable guidelines which we have earlier set forth, subtracting from the amount so determined the allowances which have been made intermediately. In that connection, it will be recognized that we have stated that there was manifest error in the allowances made on the second and third accounts and that they were consequently excessive. We are fully aware of *N. J. S.* 3A:9–8 making an unappealed from judgment allowing an account, intermediate as well as final, *res adjudicata* as to matters set forth in the section. Commissions are not among the matters specifically mentioned therein and we believe it is an open question, as an abstract proposition, whether the section is applicable to an allowance of intermediate, as distinct from final, commissions. *Cf. 7 N. J. Practice, supra,* § 1540. We are not called upon to decide it here. But the problem is, in any event, largely an academic one (except possibly where final commissions are fixed in an amount which is less than the total of those intermediately allowed). This is so because of the thesis of intermediate commissions earlier pointed out as only partial, on account compensation, with commissions to be fixed for the entire task at termination and from which figure are to be subtracted any amounts awarded during the course of administration. Ordinarily automatic correction of erroneous or excessive intermediate awards is thereby brought about. This rationale, in the sense that an erroneous intermediate allowance will have its weight in the allowance of commissions subsequently, appears to have been the long time common law approach. See *Reynolds v. Jackson,* 36 *N. J. Eq.* 515, 518 (*Prerog.* 1883), reversed 39 *N. J. Eq.* 313 (*E. & A.* 1884). *Cf. In re Simon, supra* (93 *N. J. Super.,* at *p.* 585). We are moved to make mention of the matter because the trial court, in the new award to be made for intermediate commissions on the present account as well as on any future intermediate account,

ought also to take into account that excessive commissions were allowed on the second and third accounts, in order that the total of intermediate commissions will be safely within the probable amount to be fixed on termination for the complete services of the fiduciaries.

The judgment of the Appellate Division is affirmed.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR and HALL — 5.

*For reversal* — None.