OPINION Raum, Judge: The principal question for decision is whether petitioner is chargeable (a) in 1960 with Ms share of the terminal corpus commissions from the Strawbridge Trust allocated to him during that year and (fo) in 1961 with Ms share of the corpus commissions allocated to Mm during that year in respect of the four remaining Dor-rance Trusts. The Government’s position is .that he “constructively received” such commissions in those years. The theory of constructive receipt is one of long standing, .and regulations embodying that concept have had judicial approval as far back as Loose v. United States, 74 F. 2d 147 (C.A. 8, 1934). Thus, although income is not actually reduced to a taxpayer’s possession, it is treated as constructively received by him in the taxable year when it is set apart for him, or otherwise made available to him without substantial limitation or restriction. Stated differently, a “taxpayer may not deliberately turn his ¡back upon income and thus select the year for which he will report it.” Hamilton Nat. Bank of Chattanooga, Administrator, 29 B.T.A. 63, 67. Cf. Williams v. United States, 219 F. 2d 523 (C.A. 5); Everett Pozzi, 49 T.C. 119; Joseph Frank, 22 T.C. 945, 952-953, affirmed 226 F. 2d 600 (C.A. 6); Richard R. Deupree, 1 T.C. 113; William Holden, 6 B.T.A. 605; sec. 1.451-2, Income Tax Regs. On .the other hand, “a bona fide contract ¡providing for deferred payments * * * [will] ¡be given effect notwithstanding that the obligor might have been willing to contract to make such .payments at an earlier time.” Ray S. Robinson, 44 T.C. 20, 36. Cf. Commissioner v. Oates, 207 F. 2d 711 (C.A. 7), affirming 18 T.C. 570, nonacq. 1952-2 C.B. 5 withdrawn and acq. substituted 1960-1 C.B. 5; Drysdale v. Commissioner, 277 F. 2d 413 (C.A. 6), reversing 32 T.C. 378; Commissioner v. Olmsted Incorporated Life Agency, 304 F. 2d 16 (C.A. 8), affirming 35 T.C. 429; Kay Kimbell, 41 B.T.A. 940, acq. 1940-2 C.B. 5. The issue before us is whether the 1960 and 1961 coipus commissions here in controversy fall on the side of the line controlled by the first group o,f cases or whether they are .on the other side governed by the second group of cases. The question is to a considerable extent a factual one, and differences in the facts require separate consideration of each of the commissions in issue. The 1960 Commissions From the Stranjobridge Trust.—We hold that the $178,888.78 terminal corpus commissions allocable to petitioner Oliver G. Willits in 1960 must be treated as his income for that year, and may not be spread (“deferred”) over a 5-year period beginning in 1961. In the first place, the Strawbridge Trust, the obligor, terminated its existence in 1960, and actually paid those commissions during that year. This case is therefore sharply to be distinguished from cases like Ray S. Robinson, supra, where the obligor (pursuant to a bona fide contract entered into with the taxpayer prior to the time that the latter had rendered his sendees or otherwise had completely furnished consideration for the contract) in fact did not make payment during the tax year. Nor is it a case involving a bona fide novation entered into prior to the time of payment called for in the original contract. Cf. Commissioner v. Oates, 207 F. 2d at 712. Here, the condition requiring the termination of the Strawbridge Trust occurred on August 11, 1960, petitioner had performed the services entitling him to commissions therefor, his share of those commissions was subsequently computed to be $178,888.78 and actually paid out by the trust as part of the total corpus commissions of $920,000, all prior to the end of 1960. The deferral of receipt by the taxpayer was wholly unrelated to any contractual arrangement with the obligor, the Strawbridge Trust, but was based solely upon a private arrangement between petitioner and his cotrustees who acted merely as accommodating parties in petitioner’s obvious attempt to avoid tax on this income in 1960 by spreading it over a 5-year period when it would hopefully be taxed at lower rates. Cf. James E. Lewis, 30 B.T.A. 318, 324; Leo A. Woodbury, 49 T.C. 180, 196-197. Petitioner makes much of the fact .that his so-called agreement with the other trustees was executed August 30, 1960, whereas the “Voluntary Agreement” providing for the payment of the total of $920,000 to the trustees was dated August 31, 1960, and it was not until the October 13, 1960, meeting of the trustees that such commissions were formally allocated among the four trustees with Willits’ share being fixed at $178,888.78. We think these circumstances are of no controlling significance 'here. Not only does the blunt fact remain that there was no modification of the Strawbridge Trust’s obligation to make payment, but the agreement among the trustees for petitioner’s benefit has all the earmarks of a sham. Notwithstanding the sequence of dates recited above, it is all too plain to us that the entire arrangement was worked out and at least', informally agreed to at substantially the same time on or prior to August 30, 1960. The August 30 agreement was based on the assumption that the total amount of commissions to all four trustees was $920,000 as formally approved by the “Voluntary Agreement” of August 31, and it set forth the precise portion thereof that was formally allocated to petitioner on October 13.[4] We have no doubt that the other trustees had no interest in causing petitioner’s share of the commissions to be deferred and that they acted merely as accommodating parties. They had no right to withhold any portion of the commissions due to him. And we think the attempt to spell out consideration for such withholding was spurious. The August 30 agreement itself is crudely drawn and strongly suggests its sham character. It recites that “the bank” and petitioner “are among the Trustees of the Trust under the Will of John T. Dor-rance and the Trust will partially terminate on August 31,1960.” This is an inaccurate statement, and it is inaccurate in a critical respect, as will appear shortly. There was no “partial” termination of any trust in 1960. The original Dorrance Trust had been divided into five separate trusts the preceding year. Only the Strawbridge Trust terminated in 1960, and it terminated completely at that time. The four remaining Dorrance Trusts did not terminate in any manner in 1960. Yet the August 30 agreement continues to recite, in an effort to suggest consideration for the contract, that “the Trust desires that Willits continue to serve as Co-Trustee.” But the trustees in the administration of the Strawbridge Trust, with their fiduciary obligations to the beneficiaries thereof, had no right to manipulate the payment of any obligation of that trust for the benefit of the four other trusts with entirely different beneficiaries, and the terminating Strawbridge Trust itself had no interest whatever in the future administration of the four remaining trusts. Only by erroneously treating all five trusts as though they were still a single trust was it possible to give the illusion that “the Trust desire[d]” to have Willits continue to serve as a cotrustee of the very trust paying the corpus commission,[5] and that this was the reason for withholding until later years the full commission that would otherwise be payable to him in 1960. The truth is, as we evaluate the situation, that the recitations in the agreement were only window dressing and did not in fact reflect any such give and take between the parties. The agreement was merely an arrangement among friendly parties to permit Willits to take possession of his share of the commission over a 5-year period notwithstanding that the trust was actually making payment in a single year. To be sure, the agreement also provided that if petitioner “should resign or be discharged by order of a Court as a Trustee * * * prior to April 1, 1965, he shall forfeit his right to receive any amount not paid and the bank shall distribute the unpaid amount in equal portions to the other Trustees, including the bank.” But the agreement also provided that if he should die prior to April 1, 1965, the unpaid amount was to be distributed to his surviving children. We would be very much surprised if the parties took the forfeiture provisions seriously, and there is no evidence that they gave any real consideration to the possibility of Willits’ resignation or discharge — the only conditions that might deprive him of the commissions — or that there was any reasonable likelihood that either of those events might occur. Moreover, even if one of these events did come to pass, it is doubtful that petitioner’s attempt to give away his fully earned commissions in this manner would be enforceable in the absence of any consideration for his promise, notwithstanding recitations in the agreement that it is intended to be “legally binding.” Finally, under no circumstances could these commissions revert to the S'trawbridge Trust, the obligor and payor of the income. We are of the opinion that petitioner’s corpus commissions were his for the taking in 1960; that his private arrangement with his co-trustees to defer receipt was entered into solely to accommodate him; that the recitations purporting to justify the deferral were false; and that the bank was simply acting on his behalf when it received his commissions in 1960. When the bank received those commissions, it obtained them through him by prearrangement. It had no independent right thereto. Payment by the trust in these circumstances must be regarded as payment to petitioner, and he is chargeable in 1960 with the amount thereof whether the situation be viewed as one of constructive or actual receipt. 1961 Trustees Commissions. — On March 15, 1961, James McGowan, Jr., one of the trustees of the four remaining Dorrance Trusts, died. Following his death, certain of the beneficiaries filed suit in the Superior Court of New Jersey, Chancery Division, for the appointment of a new cotrustee and for an accounting. The remaining trustees filed an answer and a counterclaim, setting forth an account and claiming commissions for services rendered during the period June 30, 1959, to March 15, 1961. On December 1, 1961, after a hearing before the Honorable John B. Wick, the attorney for the trustees submitted a previously prepared final judgment for the use of the court, which judgment provided, inter alia, that: the share of commissions of Oliver G. Willits [petitioner] shall be paid to him as follows: one-fourth thereof on January 2, 1962, one-fourth thereof on January 2, 1963, one-fourth thereof on January 2, 1964 and one-fourth thereof on January 2, 1965; Judge Wick signed the judgment, and awarded the trustees the total commissions requested of $674,213.37. He did not, however, make any division of these total commissions among the trustees, and did not award any specific amount to petitioner. Rather, in accordance with their usual custom, the trustees met a short time after the award was made, on December 14,1961, and divided the lump-sum award among themselves. At this time, the trustees formally resolved to allocate the sum of $131,107.97 to petitioner as his share of the commissions, and to distribute such commissions to him in four annual installments, as provided in the court’s decree. Petitioner received none of these commissions in 1961, and did not report his share of the commissions on his return for that year. The Commissioner does not deny that Judge Wick’s decree was binding on the trustees and effectively prevented petitioner from receiving any portion of his commissions from the Dorrance Trusts in 1961. There is no question that the Superior Court of New Jersey bad jurisdiction over the parties and over the subject matter of the proceedings, N.J. Const., art. 6, sec. 3, par. 2; see also N.J. Stat. Ann. sec. 3A: 2-1; and while it may be the practice of the New Jersey Superior Court in the absence of special circumstances to decline to exercise its jurisdiction in matters of trust administration in favor of the County Court which originally issued the letters of trusteeship, see 7 Clapp, N.J. Practice, Wills and Administration sec. 1447 (3d ed. 1962), the absence of any objection to the court’s retention of juris diction in this case renders the judgment unimpeachable. Breidenbach v. Breidenbach, 130 N.J. Eq. 214, 21 A. 2d 805 (Err. & App. 1941). The Commissioner, however, points to the fact that the court had no real interest in deferring the payment of petitioner’s commissions, other than as an accommodation to the trustees, since the Dorrance Trusts had more than sufficient funds to pay out immediately the entire amount of commissions allowed by the court. He contends that we are therefore not bound by the trial court’s decree for tax purposes, but may under the decision of the Supreme Court in Commissioner v. Estate of Bosch, 387 U.S. 456, make our own independent determination, under New Jersey law, as to when petitioner should have been entitled to receive these commissions. We think Bosch does not go that far. The Supreme Court in Bosch laid down the general rule that, where Federal tax consequences turn upon the determination or characterization of a taxpayer’s rights or property interests under State law, a Federal court is bound only by decisions of the highest court of the State, and need give only “proper regard” to the decisions of the State’s trial and intermediate appellate courts, even if the taxpayer’s rights or interests under State law have actually been “authoritatively” defined by the unappealed order of such lower court or courts. Commissioner v. Estate of Bosch, 387 U.S. 456, 465. But the principles enunciated in Bosch do not, in our view, justify a Federal court’s redetermining the rights of a taxpayer where the determination of those rights has undoubtedly been committed by State law to the sound discretion of a trial court, and such discretion has been exercised and not clearly abused. Cf. Herman A. Moore Trust, 49 T.C. 430, 440-441. The Superior Court of New Jersey, which defined petitioner’s rights to the commissions here in issue, had authority under New Jersey law to determine, in its discretion and within the limitations imposed by the will, the amount of corpus commissions to be paid the trustees. See N.J. Stat. Ann. sec. 3A: 10-1, sec. 3A: 10-2. While corpus commissions are ordinarily fixed on the final accounting of a fiduciary, wlien his work is completed and the full course of his administration can be evaluated, see In re Estate of Moore, 50 N.J. 131, 232 A. 2d 641, 647 (1967), New Jersey courts have clear authority, exercised in this very case, to allow such commissions at an earlier time, upon the rendering of intermediate accounts, “within conservative limits and with full regard for all which may transpire before the administration is completed, in order to give some limited measure of recompense to the fiduciary for time, effort and overhead.” In re Estate of Moore, supra; see also N.J. Stat. Ann. sec. 3A: 10-2. Given this authority, we think it would be incongruous indeed if a New Jersey court did not also have discretion, either upon the request of a trustee or on its own decision, to defer the payment of commissions by the trust beyond the date on which the final judgment is entered. Such authority seems clearly implied by the statutory provisions cited above, and is undoubtedly also inherent in the Chancery Division’s general equitable powers to shape a decree suitable to the circumstances before it. It is difficult to see, moreover, how a court could abuse such discretion where, at the request of a trustee, it orders that payment of his commissions be deferred. Certainly there has been no harm done the trustee who requests such an order, and the trust can only benefit from being entitled to use the funds over a longer period of time. We cannot, in short, imagine the Supreme Court of New Jersey overturning such an order. Indeed, the Commissioner does not question the propriety of the amount of commissions allowed in the decree of the Superior Court in this case, which allowance ultimately served as the basis for most of the deficiency in petitioner’s 1961 income tax. In the circumstances, we think he must give equal effect to the provision in the very same decree which limited petitioner’s right to receive those commissions to years subsequent to 1961. Finally, the Commissioner contends that even if the Superior Court’s decree is given effect, petitioner must still be charged with the constructive receipt of his full share of trustees’ commissions in 1961. Although there is considerable similarity between the 1960 Strawbridge Trust commissions and the 1961 commissions here under consideration, we think they fall on opposite sides of the line and that the doctrine of constructive receipt does not apply to the 1961 commissions. The four Dorrance Trusts did not in fact make any payment of petitioner’s share of these commissions in 1961 and the New Jersey court decree (which for the first time established the aggregate 'amount of commissions payable to all trustees) fixed the liability of the trusts to make payment in future years to petitioner just as effectively as though petitioner had entered into contracts with the trusts themselves. If he had entered into such contracts, he would have been justified, as a cash basis taxpayer, in reporting the commissions only in the years of actual receipt.[6] This is made clear by a number of cases typified by Commissioner v. Oates, 207 F. 2d 711 (C.A. 7), affirming 18 T.C. 570, supra at 613, which has now been accepted by the Commissioner, 1960-1 C.B. 5, and which established that the doctrine of constructive receipt is not applicable in these circumstances. No more than Oates is this a situation where payment was tendered and refused. The difference in result between the 1960 and the 1961 commissions in this case may not be a wholly satisfying one, particularly since the practical difference between the two situations does not appear to be great. But as indicated by the cases, supra at 612-613, a line has been drawn, albeit a thin one, and, in our judgment, the two commissions under consideration are on the opposite sides of that line. Compare Friendly, J., in Petschek v. United States, 335 F. 2d 734, 737 (C.A. 2), “If the distinction seems fragile, that is not unusual in cases near a frontier, with large hinterlands on either side.” Cf. Harrison v. Schaffner, 312 U.S. 579, 583. Decision will "be entered under Rule 50. While it is true that the amount formally allocated to petitioner on October 13 was actually $178,888.78 and the amount set forth in the August 30 agreement was $178,887.88, it is obvious that the minor discrepancy of 90 cents was merely a typographical error resulting from the transposition of two digits. Notwithstanding that each trustee signed the Aug. 30 agreement as “Trustee,” there is no merit to petitioner’s contention that the agreement was with “the Trust” rather than with the individual trustees. As indicated above, the Strawbridge Trust itself had no interest whatever in petitioner’s continued services on behalf of the four remaining trusts, and, in our view, the agreement was in fact made with the trustees acting as individuals and not on behalf of the Strawbridge Trust. Moreover, the alleged “desire" of “the Trust” that Willits continue to serve as a co-trustee is made highly suspect by the fact that upon termination of the Strawbridge Trust the two Strawbridge children established new trusts with the distributed assets naming the Camden Trust Co. as a trustee without at the same time designating Willits as a cotrustee. Of course, the mere fact that each trustee signed the agreement as “Trustee” does not preclude us from examining the situation to determine whether the capacities in which the parties are thus identified “are truthfully described by the labels' which the parties have attached to them.” See Graybar Electric Co., 29 T.C. 818, 832, affirmed 267 F. 2d 403 (C.A. 2), certiorari denied 361 U.S. 822. Such a situation would be In sharp contrast to that which transpired with respect to the Strawbridge Trust, where we found that the agreement was in fact entered into not with the trust, the payor of the income, but with the trustees in their individual capacities, who obligingly undertook to shield petitioner from tax in the year that the trust actually paid petitioner’s commissions. See p. 615, supra, and particularly fn. 5, supra.